Eloise **BRONSON**, on behalf of herself and all other persons similarly situated, Plaintiff,

v.

**CONSOLIDATED EDISON CO. OF NEW YORK, INC.**, Defendant.

No. 72 Civ. 3087.

United States District Court,
S. D. New York.

Oct. 30, 1972.

**444**

Kalman Finkel, New York City, for plaintiff; Michael D. Hampden, New York City, of counsel.

Williams & O'Neill, New York City, for defendant; Joel M. Lasker, New York City, Michael W. Solodar, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of New York, pro se appearing pursuant to Executive Law, § 71; A. Seth Greenwald, Asst. Atty. Gen., of counsel.

Peter H. Schiff, Albany, N. Y., Counsel to Public Service Commission of State of New York, amicus curiae; Joel Yohalem, Albany, N. Y., David Schechter, New York City, of counsel.

## OPINION

TYLER District Judge.

Mrs. Bronson, as a consumer of electricity supplied by Consolidated Edison ("Con Ed") and a "victim" of its termination or "electricity cut-off" procedures, challenges the latter as violative of the Due Process Clause of the 14th Amendment. Specifically, she assails the lack of any mandate, either statutory or regulatory, that a hearing prior to electricity shut-off be held in which the consumer would be afforded opportunity to rebut the company's claims before actually being left in the dark. She has moved for summary judgment pursuant to F.R.Civ.P. 56, and defendant, in effect, has cross-moved for similar relief. Defendant has also put in issue, by way of a motion to dismiss the complaint, plaintiff's claim to a federal forum under 42 U.S.C. § 1983.

## THE FACTS

The facts as set forth by plaintiff suggest an Orwellian nightmare of computer control which breaks down through mechanical and programmers' failures and errors. According to Mrs. Bronson, it all began in October, 1969 when she received bills of several times the amount she had been charged previously. Her response was to pay only what she had been accustomed to paying and to attempt, through inquiry and complaint, to set the matter straight.

Her efforts resulted in an investigation of sorts which revealed that plaintiff's landlord, at 312 93rd Street, Brooklyn, had been diverting current through her meter. Despite this discovery, the bills continued at the higher rate, and, on May 11, 1971, Con Ed shut off Mrs. Bronson's current.

After three weeks without electricity, plaintiff went to the Department of So-

cial Services, as she was then receiving welfare assistance, and on June 18 obtained and delivered to Con Ed an emergency two-party check for the $147.81 the utility was then demanding. Notwithstanding, the subsequent bills sent to Mrs. Bronson continued to demand payment of the "arrears". Service, which had been restored on June 14 at the request of the Legal Aid Society, was again expressly threatened with termination. Indeed, in mid-June, 1972, two Con Ed representatives actually visited Mrs. Bronson at her home to demand payment of billed arrears then claimed to be $175.

Con Ed in its papers here purports to contest the fact that an investigation ever took place. It asserts that it can find no record of any company employee ever going to 312 93rd Street to investigate Mrs. Bronson's allegations. But, in apparent flat contradiction of the assertion, Con Ed has furnished as an exhibit a letter it claims to have sent to Mrs. Bronson stating:

> As a result of your recent inquiry we sent a representative to verify the information on which the bill you questioned was computed because there was a possibility that it might have been based on an incorrect meter reading. (Exhibit O, Affidavit of William Sixsmith).

To buttress this self-contradiction, in answer to Mrs. Bronson's assertion that no investigation was made until sometime in 1971 (Para. 23, Plaintiff's Complaint), Con Ed has also submitted a photostat of a letter dated April 30, 1970, purportedly received from Eloise Bronson, mentioning the investigation and its findings (Exhibit E, Affidavit of William Sixsmith). The company then inexplicably adds that ". . . there is no record indicating that Mrs. Bronson ever informed the company that the landlord at 312 93rd Street had his electrical wiring attached to the meter assigned to Mrs. Bronson." (Sixsmith Affidavit, at 7.)

Con Ed in fact claims "no record" of many of the aspects of this case. No record of Mrs. Bronson requesting service at her 93rd Street address can be found, it is claimed, in spite of the admission that a field representative had visited Mrs. Bronson on December 19, 1969 and had been told by her of her occupancy there, and that the utility had then set up an account in her name. (*Id.* at 2). Likewise, "no report" of any notice of Mrs. Bronson's change of address from her former residence at 9225 5th Avenue, Brooklyn to 93rd Street allegedly has been found.

However curious this all may appear, it is mild stuff indeed when considered against the story of what happened (or did not happen) to the check with which Mrs. Bronson attempted to finally end her ordeal. Defendant first concedes that the check was delivered to its Pearl Street office, credited to Mrs. Bronson's account, and then sent to the Manufacturer's Hanover Bank. But, with remarkable self-satisfaction under the circumstances, Con Ed then asserts: (1) the check was lost at the bank; (2) "the bank notified the company that they had not received the check"; and (3) the company, "by an unknown employee", then re-entered the $147.80 deficit on Mrs. Bronson's account. (Sixsmith Affidavit, at 7).

## STATE ACTION

Small wonder, therefore, that Mrs. Bronson is now seeking relief from a court of record. The question to be asked at this point, however, is whether she may do so in a federal district court.

Plaintiff asserts that federal jurisdiction obtains under Title 42 U.S.C. § 1983, which, to be successfully invoked, requires a finding that "state action" be present. On the facts of this case, such a finding cannot be avoided.

In the relevant legal sense, Con Ed is by no stretch of the imagination a purely private enterprise. The State of New York, by an extensive statutory and regulatory scheme, has circumscribed almost every aspect of the utility's activities, and has, by the same means, grant-

ed it powers not available to a typical private concern.

Under the Public Service Law of New York, the Public Service Commission ("PSC") is given general supervisory powers over gas and electric corporations such as Con Ed (§ 66), grants, denies or revokes their franchises (§ 68), approves rates (§ 65), and has pervasive power to investigate and inspect (§§ 66, 67). Con Ed's rules and regulations must be filed with and approved by the Commission to be effective (§ 66). PSC approval is needed as well for the utility's issuance of stocks and bonds, proposed mergers, re-organization and transfer or lease of its franchise (P.S.L. §§ 69, 69–a).

Con Ed is empowered, subject again to PSC approval, to condemn private property (Transportation Corporation Law, Art. 2, § 11(3–b) ), require customer deposits (*Id.* § 13), and enter upon private property under specified conditions (*Id.* § 14). It is also directly authorized by statute to do what is challenged here by Mrs. Bronson, terminate service to a customer for non-payment of charges on 5 days' notice. (*Id.* § 15).

Where the state has so involved itself with a private concern, the concern can be said to act for the state. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Farmer v. Moses, 232 F. Supp. 154 (S.D.N.Y.1964). This involvement, both in breadth and purpose, indicates that the state has franchised Con Ed to carry on what is clearly a quasi-public function. Thus, the utility is licensed to and does act as an agent of the state. Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962) cert. den. sub nom. Ghiota v. Hampton, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170 (1962), Kerr v. Enoch Pratt Free Li-

brary of Baltimore City, 149 F.2d 212 (4th Cir.) cert. den. 326 U.S. 721, 66 S. Ct. 26, 90 L.Ed. 427 (1945). Such has been the conclusion of the majority of federal courts that have been called upon to pass on this question in the context of public utility service termination practices,[1] and is the conclusion of this court as well.

Defendant's motion, pursuant to F.R. Civ.P. 12(b)(1), to dismiss for lack of federal jurisdiction, therefore, is denied.

It bears mention in this regard, however, that what is actually challenged herein as state action might be more correctly characterized as state inaction. The comprehensive regulatory scheme under which Con Ed operates, as noted above, makes specific provision for service termination on customer default. Transportation Corporations Law § 15, in relevant part and as far as it goes, is the only express authority for termination of utilities and the manner in which such may be effected:

§ 15. *Refusal or neglect to pay rent*

1. If any person supplied with gas or electric light by any such corporation shall neglect or refuse to pay the rent or remuneration due for the same or for the wires, pipes or fittings let by the corporation, for supplying or using such gas or electric light or for ascertaining the quantity consumed or used as required by his contract with the corporation, or shall refuse or neglect, after being required so to do, to make the deposit required, such corporation may discontinue the supply of gas or electric light to the premises of such person; and the officers, agents or workmen of such corporation may enter into or upon such premises between the hours of eight o'clock in the forenoon and six o'clock in the after-

---

1. Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir., 1972), vacated on other grounds, 41 U.S.L.W. 3182. Palmer v. Columbia Gas Co. of Ohio, 342 F.Supp. 241 (N.D.Ohio W.D., 1972), Stanford v. The Gas Service Co., 346 F.Supp. 717 (D.Kan., 1972). The sole instance

brought to my attention of a contrary finding is Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir., 1972). This court is in no way bound to follow the reasoning or conclusion found therein, and declines to do so.

noon, and separate and carry away any meter, pipe, fittings, wires or other property of such corporation, and may disconnect any meter, pipe, fittings, wires or other works whether the property of the corporation or not, from the mains, pipes or wires of the corporation. But the supply of gas or electric light shall not be discontinued for nonpayment of bills rendered for service until and after a five-day written notice has been served upon such person either by delivering the same to such person personally or by mailing the same in post-paid wrapper addressed to such person at premises where service is rendered.

As plaintiff asserts, however, the state, either by statute, PSC regulation, or internal utility policy or rule, may not have gone far enough—i. e. that further action may be necessary to render constitutional what affirmative steps the state has already taken.[2]

## DUE PROCESS ATTACHES

■ Looking to the merits of plaintiff's claim, there is strong likelihood that she is "entitled" to demand that due process be complied with by Con Edison in its attempt to terminate her electric service. It has now been clearly established that once the state has undertaken to provide a service to the public, be it welfare[3] or unemployment benefits,[4] drivers' licenses[5] or tax exemptions,[6] it must then comply with the requirements of due process before it can terminate access to such service or benefits in the case of any given individual. This is the concept of the "entitlement", which provides the individual with his only line of defense against arbitrary withdrawal by the state of his

access to what, although initially not his right to demand, he has become dependent upon. *Bell* 402 U.S. at 539, 91 S.Ct. 1586, *Goldberg* 397 U.S. at 262–3, 90 S. Ct. 1011.

■ It is beyond doubt that electric service can become as vital to the existence and livelihood of an individual as a driver's license or a welfare check; indeed, it has been held on several occasions that when termination of such service is threatened the same constitutional safeguards apply. Ihrke v. Northern States Power Co., *supra*, Palmer v. Columbia Gas Co. of Ohio, *supra*, Stanford v. Gas Service Co., *supra*.

The one instance known to the undersigned of a holding in favor of the utility on a customer challenge of this nature is the recent decision of the Court of Appeals for the Seventh Circuit in Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7 Cir. 1972). *Lucas*, however, turned on a finding that no "state action" or action "under color of state law" was present, not a determination that no entitlement would exist had the threshold question under 42 U.S.C. § 1983 been answered the other way.

## A PRE–TERMINATION HEARING NEEDED

Once it is accepted that Con Ed's shut-off practices are to be measured against the requirements of due process, it must then be determined just what those requirements are.

■ At the core of due process is the notion that fairness can only be served by granting notice and an opportunity to be heard to someone about to be deprived of a personal or property right. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Sniadach

2. In this light, the absence of the Commissioner of the PSC and the Attorney General of the State of New York as defendants is conspicuous. Depending on the nature of the relief ultimately to be prayed by plaintiff, it could prove material.

3. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

4. Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L.Ed.2d 965 (1963).

5. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 20 L.Ed.2d 90 (1971).

6. Speiser v. Randall, 357 U.S. 513, 78 S. Ct. 1332, 2 L.Ed.2d 1460 (1958).

v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). This basic requirement has been held by the Supreme Court to apply in the context of an entitlement termination. Goldberg v. Kelly, *supra* (termination of welfare benefits); Bell v. Burson, *supra* (suspension of drivers' licenses).

■ The rule, however, is not absolute. As pointed out by the Court in *Goldberg,* a prior hearing may be foregone where the government's interest in a summary adjudication substantially outweighs the extent of the deprivation facing the individual. But, looking to those instances where the government has been able to put forward so compelling a state of facts, it is only where time is of the essence that such a practice is tolerated. See *Goldberg,* 397 U.S. at 263, 90 S.Ct. 1011, citing Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamin product); North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of food not fit for human use). See also Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921); Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604 (1921); and United States v. Pfitsch, 256 U.S. 547, 41 S.Ct. 569, 65 L.Ed. 1084 (1921) (wartime exercises of the police power).

Con Ed cannot persuasively claim that what it has set forth as its basic concerns—potential cash flow decreases, greater administrative burdens, and added expenses—fall into the above category. It has already been held that an individual's interest in the maintenance of his welfare or unemployment benefits pending determination of his continued eligibility outweighs any resulting administrative burden on the state, as well as the possible financial loss because of inability to recover such payments after the individual is found not entitled to them.[7] Even where a state has sought to protect victims of auto accidents by giving uninsured drivers involved in an accident the choice of posting a bond to cover any damage award that could result against them or having their license and car registration suspended, the individual's interest in being able to drive pending a determination of liability has prevailed. Bell v. Burson.[8]

■ A number of courts have been faced with the precise question of whether due process requires notice and a hearing prior to public utility service termination. And, in all but one instance,[9] after weighing the interest of the consumer against the interests of the utility, the answer has been in the affirmative.[10]

The courts so answering have recognized the distressing realities of the customer's plight. They have found that, more frequently than not, the customer is confronted by an impersonal bureaucracy held together by computers, wherein inefficiency and a resultant high level of error[11] are the norm, and unresponsiveness or "run-arounds" the only answer to his inquiries.[12]

## ADEQUACY OF PRESENT PRACTICES

### A. THE HEARING

■ While it is clear that the Constitution requires a prior hearing when an

7. *Goldberg* 397 U.S., at 266, 90 S.Ct. 1011.

8. 402 U.S. 535, 91 S.Ct. 1586, 20 L.Ed.2d 90 (1971).

9. Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir., 1972) (dictum).

10. Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir., 1972), vacated on other grounds, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72, Palmer v. Columbia Gas Co. of Ohio, 342 F.Supp. 241 (N.D.Ohio

W.D., 1972), Stanford v. The Gas Service Co., 346 F.Supp. 717 (D.Kan., 1972).

11. 16% of those complaints actually investigated by the Public Service Commission result in adjustments in favor of the customer. PSC brief at 6.

12. Note, in this regard, the findings of Judge Young of the Northern District of Ohio, W.D., when the practices of the Columbia Gas Company of Ohio were scrutinized. Palmer v. Columbia Gas Co. of Ohio, 342 F.Supp. at 243.

entitlement is threatened with termination by the state, there is no precise form that such a hearing must take. Due process, when taken from principle to practice, demands only that what is available be fundamentally fair to the individual in light of the specific facts and circumstances of a given situation. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In the case at hand, and at this early stage thereof, this court in fairness must assume that Mrs. Bronson's nightmare may have been an aberation, an unfortunate coincidence of mistakes, and in no way indicative of the viability of present practices. It may even be the case that affording a delinquent customer 5 days' notice of termination, given the remedies available to those who would contest the utility's claims, is a constitutionally acceptable form of prior hearing in this context.

■ Looking specifically to the remedies available to the customer upon receipt of a termination notice, two can be eliminated rather summarily from consideration. The fact that emergency relief may be sought in the state courts is a recourse far better in theory than in practice. The disputed amounts are almost never of sufficient magnitude to justify the cost of going to court and, as realistically assessed by the court in *Lucas*, such cases will almost never be brought.[13]

The second of these "non-alternatives" is that of paying first and contesting later, which, in real terms, is no more than avoiding one pre-hearing deprivation by accepting another. This runs directly counter to the sense of *Bell*.[14]

■ What does merit serious scrutiny, however, is the effectiveness of the more informal remedies defendant claims are available to a customer who brings his dispute directly to the utility

or the PSC. According to Con Ed, when it receives a customer challenge to a bill, a "withhold" is placed on any imminent service shut-off, and maintained until the matter is investigated and the customer notified of the findings. (Affidavit of Sixsmith, at 7.) Even where the termination date is reached and no "withhold" has been requested, an attempt is made to contract the delinquent customer by phone, in person, or via Western Union Mailgram in an effort to settle the matter of the arrears before actual service shut-off. (Affidavit of Allen R. Gordon, Director of Credit and Collection of Con Ed, at 6–7.)

Should the customer go instead to the PSC, the results are alleged to be essentially the same. The practice appears to be that upon receipt of a customer's complaint the PSC issues to Con Ed a form No. EG 1 (Rev. 2/72). Receipt of one of these forms, Con Ed asserts, results in an immediate "withhold", (Sixsmith affidavit, at 10), although it is elsewhere admitted that the utility is not obligated by rule or statute to do so. (PSC brief, at 6–7). Instead, it is done as a matter of "comity", based on a "long standing working relationship" (*Id.* at 6, Defendant's Memorandum In Support of The Motion to Dismiss The Plaintiff's Complaint, at 27).

Once such a form issues, which is generally "but not invariably" the case, (PSC brief, at 6), some form of investigation occurs. The utility is directed to assemble the necessary data and forwards it to the PSC and, according to "present procedures", does so within 30 days. (Sixsmith affidavit, at 10.) The PSC then reaches a finding, advises the customer of it, and, in some unstated manner, advises him that rebuttal is possible (*Id.*) In the rare instance of both customer and utility dissatisfaction with the PSC decision, both may appear before a PSC representative or examiner. (*Id.* at 10–11).

13. *Lucas* at 647 of 466 F.2d.

14. See n. 8 and accompanying text at 448 *supra.* In the case of Mrs. Bronson, who, in her attempt to utilize this alternative, was forced to obtain an emergency check from the Department of Social Services, the state does no more than pay one of its branches at the expense of another.

Is this combination in fact sufficiently consistent and regular to operate as a guarantee to the customer, or is it not? All that has been presented to illustrate the day to day efficacy of this arrangement of informal remedies is the situation of Mrs. Bronson and a statement in the Sixsmith affidavit that during the six months from January 1, 1972 to June 30, 1972, 9,385 billing inquiries were received by the PSC, 8,886 of which have been "processed" (at 11). There are the reminders of plaintiff that these remedies are not in any way mandated, but exist subject to the willingness of Con Ed and the PSC to continue them.

Clearly, no determination as to whether these practices in fact accord fundamental fairness can be made on the present state of the record.

## B. NOTICE

 The most carefully and fairly arranged machinery for dispute resolution is of little value to those who do not know of its existence. Whatever is found to satisfy the constitutional requirement that a pre-termination hearing be made available must therefore be complemented with provisions insuring that adequate notice be given. (*Fuentes, supra,* at 12).

 Existing practices of Con Ed, however, appear to take little account of this aspect of due process. Mrs. Bronson, when slated for service termination, received from Con Ed no more than a single slip of paper, not measuring significantly more than 3 inches by 8 inches, which, aside from dates, dollar amounts, account numbers, and her address bore only the simple warning

> TURN–OFF NOTICE—
> WE ARE SORRY, BUT
> YOUR SERVICE WILL BE
> DISCONTINUED UNLESS
> THE TOTAL AMOUNT
> SHOWN BELOW IS PAID
> BY MAR 02 1970.

No notice of what may be the obvious, that Mrs. Bronson could have notified Con Ed of her intention to register a complaint, is given, nor is there any information imparted as to recourse to the PSC.

In determining the constitutional adequacy of what purports to be notice in any given context, courts look to the practical realities of circumstances at hand. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The "reality" in the case at bar, however, is that Con Ed has not undertaken in any way to advise the customer of the recourses allegedly available to him or her, notwithstanding that an appropriate paragraph seemingly could be added to the utility's notice of turn-off form with relative ease and minimal expense. Thus, whatever form of hearing is ultimately determined appropriate in this case, it is clear now that customers such as Mrs. Bronson are entitled to more adequate notice.

## CONCLUSION

To summarize, although plaintiff is correct in her contention that some form of pre-termination hearing is constitutionally required, the record as it stands cannot support a determination as to the adequacy of present practices. And, despite the finding herein that the existing notice of termination cannot pass constitutional muster, no determination of what would be adequate in this regard can be made without taking into account the nature of the hearing for which notice will be given.

Summary judgment in favor of either party is therefore inappropriate at this time. Counsel are directed to supplement the record as this memorandum indicates is needed, and, are invited to do so by affidavit, brief, or hearing. In order to more efficiently direct the course of such subsequent action, the parties, intervenor Attorney General and the Public Service Commission as amicus curiae are requested to attend a conference in Room 1305 on Friday, November 17, 1972 at 3:30 P.M.

It is so ordered.