James F. HATTELL and Ann Hattell, individually and on behalf of their minor children, Melvin J. Hattell and Mary L. Hattell, Plaintiffs,

v.

PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation, Defendant.

Civ. A. No. C-4206.

United States District Court,
D. Colorado.

Nov. 7, 1972.

Terrance R. Kelly and John B. Kusic, East Denver Legal Services, James H. Seckinger, Legal Aid Society of Metropolitan Denver, Kokish, Garner & Bender by Michael L. Bender, Denver, Colo., for plaintiffs.

Lee, Bryans, Kelly and Stansfield by Richard W. Bryans, Denver, Colo., for defendant.

## MEMORANDUM OPINION

WINNER, District Judge.

Plaintiffs seek declaratory and injunctive relief as well as damages against Public Service Company. The action is brought under 42 U.S.C. § 1983, and jurisdiction is said to be founded on 28 U.S.C. § 1343 as well as on 28 U.S.C. § 1331 because in plaintiffs' view the case arises under the Constitution of the United States. Jurisdiction of the several accompanying claims is said to be pendent.

Accepting the averments of the complaint as true [which, of course, we must do on this motion to dismiss] defendant is a public utility operating under the close supervision of the Colorado Public Utilities Commission. Public Service supplies gas and electric service in Denver under an exclusive franchise from the city. Plaintiffs were customers of defendant. When plaintiffs rented an apartment at 1211½ Kalamath Street in Denver, their landlord directed that they arrange for gas and electric service for their own and the other apartment in the building [there was only one gas and one electric meter for both apartments] and to collect a pro rata share of the bill from the other

tenant. Plaintiffs arranged for the service and paid a $25 deposit. Defendant failed to read the meters for two months, misread them for February, 1972, and failed to read the meters in March, 1972. Plaintiffs paid Public Service its bill of $19.40 in March, and thought that their bill was current. In April, 1972, Public Service sent bills for $126.88 for services furnished to the Kalamath Street address, but, by this time, plaintiffs had moved to 1804 E. 17th Avenue, Denver. On May 25, 1972, plaintiff paid $40 to defendant, and on July 26, 1972, they paid $20 on their old bill, offered to make all payments on current service as they became due, and tried to arrange for time payments on the balance. Public Service refused to accept any time payments on the past due account. The next day, a collector arrived at plaintiffs' new home with instructions to collect the account in full or turn off the service being furnished at the new house. Plaintiff, James Hattell, telephoned the company to explain the hardship which would result to him, his wife and his two children. He again tried to arrange time payments for the unexpectedly large claim by Public Service. He was told nothing could be done and, in effect, was told "to pay or else." True to its word, that same day, service at plaintiffs' new home was shut off by Public Service because of the alleged arrearage at the old house.

Plaintiffs went to the Legal Aid Society, and on July 29, 1972, an attorney for East Denver Legal Services tried to persuade Public Service to work out the problem. According to his affidavit attached to the motion for a temporary restraining order,[1] counsel telephoned the Accounts Information Service at Public Service, and "transmitted to the defendant the plaintiffs' offer to pay the current month's bill of $12.31, plus $20.00 on arrearages on or before August 11, 1972 [plaintiff James Hattell's next payday] and continue to pay the monthly

bill plus $20 a month on arrearages until the account was current." The offer was refused, and the only counteroffer was to accept payment of half the bill in July and the other half in August, with the proviso that service would not be reinstated until the first half was paid. With plaintiffs' inability to pay in mind, the company might as well have demanded cash in full and on the spot. Counsel's affidavit continues, "I asked Mr. Fenton if the decision was his or if I could speak to a Supervisor who perhaps could be more flexible." According to the information given to counsel, there was no appeal from the Account Information Department's rule.

Plaintiffs say that they are entitled to some sort of a hearing before their service can be terminated—a hearing either before a responsible company official or some impartial person, perhaps a representative of the Colorado Public Utilities Commission. Plaintiffs contend that the activities of Public Service Company are "state action" within the meaning of 42 U.S.C. § 1983, and that the failure to provide any kind of a hearing deprives them of due process. Plaintiffs' other claims for monetary damages which rest on pendent jurisdiction are made under assorted theories of tort and contract law.

Extensive briefs have been filed by both parties, and it would serve no purpose to review all of the cases cited and relied on by the parties, but we purpose to discuss the principal cases argued in the briefs.

As we all know, 42 U.S.C. § 1983 says:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

[1]. A cease fire was agreed to after the case was filed, and the motion for a temporary restraining order was withdrawn.

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This statute of Civil War origin has been expanded in its coverage by many recent decisions, but, for it to apply, plaintiffs must demonstrate:

"The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' This second element requires that the plaintiff show that the defendant acted 'under color of law.'" Adickes v. S. H. Kress Co. (1969) 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

Most recently, the Supreme Court struck down state replevin statutes which afforded no hearing before repossession by the seller for nonpayment of installment charges. Fuentes v. Shevin (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556. There the repossession stemmed from state statutes, and it was held that these statutes were constitutionally infirm because the purchaser had no right to a hearing of any sort before being deprived of possession of the household goods which were replevined. The Court seemingly left open the type of hearing which was required, because it is said at 407 U.S. 86, 92 S.Ct. 1997:

"The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause. While the length and consequent severity of a deprivation may be another factor to weigh in determining the appropriate form of hearing, *it is not decisive of the basic right to a prior hearing of some kind.*"

Lynch v. Household Finance Corp. (1972) 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424, had to do with prejudgment garnishment statutes. It was before the Court on review of a dismissal by the lower 3-judge court for the assigned reasons that, (a) 42 U.S.C. § 1983 and 28 U.S.C. § 1343 created no jurisdiction over property rights, and (b) the relief prayed would violate the anti-injunction statute, 28 U.S.C. § 2283. The Supreme Court reversed on both grounds. It was held:

"In dismissing the appellant's complaint, the District Court held that § 1343(3) applies only if 'personal' rights, as opposed to 'property' rights, are allegedly impaired. The Court relied on the Second Circuit Court of Appeals' decision in Eisen v. Eastman, 421 F.2d 560, 563, which rested, in turn, on Mr. Justice Stone's well-known concurring opinion a generation ago in Hague v. CIO, 307 U.S. 496, 531, 59 S.Ct. 954, 83 L.Ed. 1423.

. . .

"This Court has never adopted the distinction between personal liberties and proprietary rights as a guide to the contours of § 1343(3) jurisdiction. Today we expressly reject that distinction.

. . . . . .

"Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is, in truth, a 'personal' right, whether the 'property' in question be a welfare check, a home or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other. That rights in property are basic civil rights has long been recognized."

Thus, we are confronted with the necessity for decision as to whether the actions here challenged are "state actions" within the meaning of § 1983, and the

decision is not an easy one. Moose Lodge No. 107 v. Irvis, (1972) 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, emphasizes the difficulty of the determination. *Moose Lodge* was a discrimination case. There Irvis, "while conceding the right of private clubs to choose members upon a discriminatory basis, (asserted) that the licensing of Moose Lodge to serve liquor by the Pennsylvania Liquor Control Board amounts to such State involvement with the club's activities as to make its discriminatory practices forbidden by the Equal Protection Clause of the Fourteenth Amendment." The Court reviewed some of its earlier decisions defining state action, and it said, "Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition." The opinion then discusses the extent of control exercised over Moose Lodge by the Pennsylvania Liquor Control Board, and it concluded that "With the exception hereafter noted, the Pennsylvania Liquor Control Board plays absolutely no part in establishing or enforcing the membership or guest policies of the club which it licenses to serve liquor." The exception referred to was a Liquor Control Board regulation that required each club to "adhere to all the provisions of its constitution and by-laws." The Court concluded that the constitution and by-laws of the lodge were not subject to successful constitutional attack, but the Liquor Board regulation was held invalid.[2]

In deciding whether public utility companies' termination actions constitute state action, the Seventh and Eighth Circuits are in sharp disagreement on quite similar, although not identical, facts.

In Kadlec v. Illinois Bell Telephone Company (1969) 407 F.2d 624 and in Lucas v. Wisconsin Electric Power Company (1972) 466 F.2d 638, the Seventh Circuit held that similar fact situations did not constitute state action. *Lucas* was decided by the Court en banc, with Chief Judge Swygert and Judge Sprecher dissenting.

A contrary result was reached by the Eighth Circuit in Ihrke v. Northern States Power Company (May 3, 1972) 459 F.2d 566. Although there were dissents as to a class action problem and as to a question of mootness,[3] the opinion was unanimous that there was state action. A petition for rehearing en banc was denied. *Ihrke* was followed by Judge Theis in Stanford v. Gas Service Company (July 13, 1972) (D.C.Kansas) 346 F.Supp. 717. *Kadlec, Lucas, Ihrke* and *Stanford* review all of the authorities and all of the legal arguments, both pro and con. To again quote from all the authorities would serve only to extend this opinion beyond tolerable length. Suffice it to say that with a few explanations we shall make presently, we adopt the reasoning and the conclusions of *Ihrke* and *Stanford*—at least as applied to the facts here pleaded.

As was noted in *Ihrke*, the concurring opinion in *Kadlec* said that "Under appropriate circumstances, it may be possible to demonstrate that a privately-owned publicly-regulated utility or car-

2. Related cases are Evans v. Newton (1966) 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373, Burton v. Wilmington Parking Authority (1961) 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, Peterson v. Greenville (1962) 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, Shelley v. Kramer (1948) 334 U.S. 1, 68 S.Ct. 836, 92 L.

Ed. 1161, and Adickes v. S. H. Kress and Co., (1970) supra [398 U.S. 144, 90 S.Ct. 1598.]

3. On October 10, 1972, 41 L.W. 3167, 3182, the Supreme Court vacated the Eighth Circuit's judgment because the case was moot. The plaintiff was no longer a customer of the utility company.

rier or similar entity has a sufficient nexus with or dependence on a state as to make some of its actions under color of law." [4] The opinion then lists seven factors which could be taken into consideration, and most assuredly plaintiffs' counsel has read that case and has paid close attention to those enumerated factors, because all are pleaded, either verbatim or in substance. Thus, insofar as the concurring opinion in *Kadlec* is concerned, the case is not of much help to defendant.

*Lucas* holds that the Wisconsin regulation there involved was valid because:

"The action of the state which plaintiff seeks to restrain has neither enhanced the Company's powers nor diminished plaintiff's rights. The 'state action' in promulgating § 113.13(4) of the regulations did not deny plaintiff due process of law.

"What plaintiff really seeks is not an injunction against the state's action, but an affirmative command that it act more effectively."

As to the company, *Lucas* holds:

"We conclude that Wisconsin Electric's private action in terminating service to a delinquent account after five days notice derives, at best, insignificant support from the State of Wisconsin and is therefore not 'under color of' state law or custom within the intendment of § 1983."

Literally read, *Lucas* cannot be reconciled with either *Ihrke* or *Stanford*, but, when the opinion is fully analyzed, it may be doubtful that the Seventh Circuit would reach the same conclusion on the facts pleaded in our case. There are at least the following distinguishing facts:

(a) The procedures adopted by the Wisconsin Commission made provision for a sort of a hearing on customer complaints.

(b) The power company itself made provision for a "hearing" of the dispute, and the court said, "since the conclusion of the 'hearing' conducted by the Power Company itself is only a preliminary and tentative determination of the ultimate rights of the parties, the fairness of that hearing must be appraised in the context of the entire procedure made available by the state . . . . A lesser standard applies to determinations which are only tentative in character even though they have an immediate and significant impact on the litigant."

(c) Wisconsin Power Company had "reexamined for the purpose of correcting possible error," but our complaint says there is no avenue for re-examination by Public Service.

(d) The record in *Lucas* showed that "existing procedures provide a meaningful protection against the risk that the Power Company will cut off service when it 'has little probability of success on the merits' of a dispute with a customer." The charges made here are that there is no such meaningful protection.

(e) The disconnect which is the subject of our lawsuit would have been illegal under the Wisconsin Commission's regulations, because they provide:

"6. Service may not be denied at one location because of the customer's failure to pay a bill at a previous location.

"7. Service may not be denied at the same location to a customer who

---

4. We are troubled by the manifest inconsistency which could result under *Lucas* when private utilities are compared to municipally owned plants, especially those owned by home rule cities in Colorado. Then, of course, half way in between are the rural electrics with their government financing.

has paid the current bill but who has some old delinquent bills still owing to the company."

Most importantly, under the averments of our complaint, *Lucas* might well have reached the opposite conclusion, because the Seventh Circuit majority said:

"It is true that the Company's powers are enhanced in at least two respects by the state. First, the state has authorized an electric company to enter private property under certain circumstances. *If that authority were invoked by the defendants in this case, an entirely different issue would be presented.* On the record before us, however, it appears that the termination of plaintiff's service can be completed simply by throwing the proper switch or disconnecting the proper wires." [emphasis supplied]

The complaint here effectively says that defendant's agents in fact entered private property.

On the other hand, *Ihrke* which is favorable to plaintiffs is also subject to factual distinctions, and it must be remembered that the Supreme Court vacated the judgment in *Ihrke*, albeit the court's action did not reach the merits. After reciting the elements mentioned in the concurring opinion in *Kadlec*, Judge Ross stressed the fact that the City of St. Paul received 5% of the power company's gross earnings, and this profit sharing arrangement admittedly is not present in our case. However, Colorado power companies pay a franchise fee or tax, and we can see no great difference between a flat fee and a profit sharing agreement. Defendant argues that in Colorado a power company can supply services without a franchise, and this is technically correct, but, except during periods of franchise negotiation, they operate under franchises. Differences in property tax impact under Colorado law make franchises inevitable. *Ihrke* concluded:

"Federal courts have generally recognized private conduct as 'color of law' or 'state action' when it performs a 'public' function and is subjected to 'public' regulation. In Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) [a private park whose management was entwined with municipal control], the Supreme Court said:

" 'Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. . . . That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities . of the State and subject to its constitutional limitations.' "

When defending against a requirement for a minimal hearing in advance of a utility shutoff, we are sure that all utility companies share the view that their conduct is not state action, but it all depends upon whose ox is being gored. When charged under the antitrust laws, utility companies vigorously argue that their conduct is exempt because it is state action. Gas Light Co. v. Georgia Power Co. (1972) 5 Cir., 440 F.2d 1135, Washington Gas Light Co. v. Virginia Electric & Power Co. (1971) 4 Cir., 438 F.2d 248.

As did Judge Theis in Stanford v. Gas Service Company, we agree with the Eighth Circuit, and we hold that the charges here made involve state action, and that we have jurisdiction of the basic dispute under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.[5]

5. The rationale is similar to that in Burr v. New Rochelle Municipal Housing Authority (1972) 347 F.Supp. 1202, D.C. N.Y.

The motion to dismiss the First and Second Claims is denied, but in denying the motion, we express no opinion as to the type of hearing which may be required. We do not at this time go as far as did Judge Sprecher in his dissent in *Lucas*:

"I would hold that, prior to the discontinuance of power because of a disputed account, the disputant is entitled to some kind of hearing before an impartial arbiter other than representatives of the public utility."

It may be that we will finally agree with the majority in *Lucas* that the company could provide its own "hearing" [although in *Lucas* there was the second informal hearing before the Commission]. The difficulty here is that under the averments of the complaint, not even a company "hearing" is provided for.[6] We share the views of Judge Theis that the Public Utilities Commission may desire to appear as amicus curiae in this case, and their help and expertise would be welcome, because it is apparent from the decisional dates of the cases discussed that we face a new and rapidly developing field of the law which would have impact on the Colorado Public Utilities Commission and its activities.[7]

■ The motion to dismiss the Third, Fourth and Fifth Claims is granted. In dismissing these claims, we do not reach the question of whether they state a claim for relief. Rather, since they can be in the federal court if at all only as pendent to the First and Second Claims, we apply the tests of United Mine Workers v. Gibbs (1966) 383 U.S. 715, 86 S. Ct. 1130, 16 L.Ed.2d 218, and in the exercise of the discretion there allowed, these claims are dismissed in the interest of "judicial economy, convenience and fairness to litigants," and to avoid needless decision of state law.

---

6. It should be emphasized that the ruling here made is on motion to dismiss. The facts proven at time of trial may well bring about a contrary result, and, by time of trial, there may be additional appellate authority on the question.

7. At oral argument plaintiffs' counsel intimated that he would be satisfied with a hearing before a company official not employed in the collection department. A Public Utilities Commission rule requiring opportunity for such a company sponsored hearing might resolve the case.