**Ethel LIMUEL, Individually and on behalf of all others similarly situated**

**v.**

**SOUTHERN UNION GAS COMPANY.**

**Civ. A. No. 74-CA-128.**

United States District Court,
W. D. Texas,
Austin Division.
July 5, 1974.

William Peel Allison, Bobby R. Taylor, Legal Aid & Defender Society of Travis County, Austin, Tex., for plaintiff.

Barr McClellan, Clark, Thomas, Denius, Winters & Shapiro, Austin, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

Plaintiff brings this cause pursuant to 42 U.S.C. § 1983, alleging that Defendant has, while acting under color of State law, deprived her and other persons similarly situated of rights secured by the Due Process Clause of the Fourteenth Amendment. Jurisdiction is conferred on this Court by 28 U.S.C. § 1343(3) and (4). Plaintiff brings this suit as a class action. The Court finds that the requirements of Fed.R.Civ.Proc. 23(a) and 23(b)(1)(B) have been satisfied, and that Plaintiff shall be allowed to prosecute this cause as a class action on behalf of all consumers of gas service provided by Southern Union Gas Company pursuant to franchise of the City of Austin, Texas, who, for non-payment of debts allegedly owed to Defendant Gas Company, have had or will have their gas service terminated by Defendant. Pursuant to Fed.R.Civ.Proc. 65(a)(2), the Court has consolidated the hearing of Plaintiff's request for preliminary injunction with the trial of the action on the merits. Having heard all testimony, evidence and argument submitted by the parties, the Court now enters this Memorandum Opinion and Order, constituting its findings of fact and conclusions of law.

Plaintiff seeks declaratory and injunctive relief relative to the threatened termination of her natural gas service by Defendant, a public utility franchised by the City of Austin, pursuant to Vernon's Tex.Rev.Civ.Stat.Ann. art. 1175, § 12, to provide natural gas service to residents of Austin. The dispute arises from bills submitted by Defendant to Plaintiff for service during the months of December 1973 and January 1974. Plaintiff contends the bills in question reflect an excessive amount of gas used because of a leak in the gas line over which Southern Union had exclusive control. Defendant responds that the bills are accurate and that, in any event, the customer must bear responsibility for any leak that might increase the amount of gas passing through her meter.

Plaintiff requested an administrative hearing on the matter before a disinterested arbiter. After some investigation on its part, Southern Union responded to Plaintiff's request by notifying her that service would be terminated unless she paid the disputed bills. Plaintiff has paid all bills except those for the period in dispute. The pre-termination investigation conducted by Defendant in Plaintiff's case consisted of reference of Plaintiff to a "customer consultant" who

compared Plaintiff's bills to those of previous years, and the dispatching of a serviceman to Plaintiff's residence. The serviceman reported that he found a small leak in the line leading into Plaintiff's meter, but that it should not have affected Plaintiff's meter reading.

This Court cannot and will not involve itself in the merits of the dispute regarding the amount of Plaintiff's gas bills or her liability therefor. Plaintiff has no constitutionally protected right to free gas service. The service provided by Defendant is essentially a "private service," which is "provided directly, in discrete amounts, to identifiable individuals. . . ." Moon & Moon, The Property Tax, Governmental Services, and Equal Protection: A Rational Analysis, 18 Vill.L.Rev. 527, 577 (1973).

> Here, the individual's relation to the governmental unit providing the service is essentially that of a consumer to a seller of any commercial product. Although the governmental unit does have a higher duty than a private seller in that it must sell to all, neither it nor the private seller has a duty to provide its services or product free to the poor.

*Id.* at 577–78. Thus, our inquiry must be limited to the narrow question of whether the Due Process Clause assures Plaintiff the right to a pre-termination determination of her contested liability to Defendant by a disinterested arbiter, with certain minimum requirements of due process. For purposes of this inquiry it is sufficient to find, and we do find that Defendant contests the accuracy of her bills, and that there is a substantial question as to her liability therefor.

We note, preliminarily, that this is not an action to enjoin the operation of "any order affecting rates chargeable by" Defendant, and that this case is, thus, outside the operation of 28 U.S.C. § 1342.

■ For Plaintiff's claim to be cognizable under 42 U.S.C. § 1983, Plaintiff must show: 1) That Defendant has deprived her of a right secured by the "Constitution and laws" of the United States; and 2) That Defendant acted "under color of law." *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The constitutional violation alleged by Plaintiff, the deprivation of "property" without "due process of law," is clearly encompassed by § 1983. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S. Ct. 1113, 31 L.Ed.2d 424 (1972). To invoke the Due Process Clause, however, Plaintiff must demonstrate a "property" interest as evidenced by "a legitimate claim of entitlement." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The majority of courts considering the question have had no difficulty in considering continued utility service without termination except for cause to be a "property" right within the meaning of the Fourteenth Amendment. *See* Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d 153 (6th Cir. 1973); Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir. 1972), vacated as moot, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); Salisbury v. Southern New England Telephone Co., 365 F.Supp. 1023 (D.Conn.1973); Bronson v. Consolidated Edison Co. of New York, 350 F.Supp. 443 (S.D.N.Y. 1972); Hattell v. Public Service Company of Colorado, 350 F.Supp. 240 (D. Colo.1972); Stanford v. Gas Service Co., 346 F.Supp. 717 (D.Kansas 1972); Lamb v. Hamblen, 57 F.R.D. 58 (D. Minn.1972). *Cf.* Jackson v. Metropolitan Edison Company, 483 F.2d 754 (3rd Cir. 1973). The evidence in the instant case abundantly supports the proposition that the consumer's expectation of continued availability of service from Defendant, as a public utility, was "secured by 'existing rules or understandings.'" Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Tex.Rev.Civ.Stat.Ann. art. 1446a, § 1, a statute designed to protect public utilities from disruption by picketing, threats or intimidation, states:

> It is hereby declared the policy of this state that continuous service by public utilities furnishing . . .

natural or artificial gas . . . to the public is absolutely essential to the life, health and safety of all the people, and that the wilful interruption or stoppage of such services by any person or group of persons is a public calamity which cannot be endured.

Moreover, Section 9 of the Ordinance of the City of Austin (August 12, 1948), granting Defendant its franchise, states:

Grantee shall at all times during the terms of this franchise furnish natural gas service to the City of Austin, and to the inhabitants thereof demanding same, which shall be at all times first-class and modern in every respect, and sufficient to meet all reasonable demands. . . .

While the Ordinance clearly contemplates Defendant's right to collect "a reasonable price for gas sold," to be fixed by the City, it is clear that the policy of both the State and City is to foster "legitimate reliance," Perry v. Sindermann, *supra* at 600, 92 S.Ct. 2694, upon the expectation of continued gas service, absent termination for cause. Such an "existing rule or understanding" is not to be lightly disregarded in terminating a service so essential to the modern life of a customer who has purchased appliances, arranged his dwelling, and planned his life in reliance thereon. "There is no question of the entitlement involved." Palmer v. Columbia Gas of Ohio, 342 F.Supp. 241, 244 (N.D.Ohio 1972).

■ We turn, then, to the intertwined questions of whether Defendant acted "under color of State law" within the meaning of 42 U.S.C. § 1983, and with the requisite "State action" to invoke the application of the Due Process Clause. The mere fact that Defendant is regulated by the State and City is clearly insufficient to render its every action "under color of State law." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 513 (1972). Many industries are heavily regulated by the Government without being regarded as "instrumentalities of the State."

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

■ The present case presents much more than mere governmental regulation, however. This case is distinguishable from the leading case declining to find a utility termination to be "under color of State law," Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972), in that the evidence clearly shows the City to be both a "joint participant" in and a "direct beneficiary" of Defendant's business. The City participates directly in Defendant's revenues, receiving each year the sum of $1250 in cash, plus 2% of Defendant's gross receipts from the sale of natural gas and merchandise. (The evidence reflects that the City's 2% of Defendant's gross revenues amounted to $715,505.14 for the most recently completed fiscal year.) Defendant is given by State law the "right and power to enter upon, condemn and appropriate the lands, right of way, easements and property of any person or corporation," Tex.Rev.Civ.Stat. Ann. art. 1436, and the "power to lay and maintain pipes, mains, conductors and other facilities used for conducting gas through, under, along, across and over all public highways, public roads, public streets and alleys, and public waters within this State." Tex.Rev.Civ. Stat.Ann. art. 1436b, § 1. The City retains the right to set Defendant's rates (Ordinance of August 12, 1948, supra at § 13), and authorizes termination of service until a customer's indebtedness has been paid. (*Id.* at § 7). These are but illustrative examples of the extent of the City's involvement in Defendant's operation. This interdependence between the City and Southern Union brings this case within the purview of Evans v. Newton, 382 U.S. 296, 301, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966):

If the municipality remains entwined in the management or control of the

park, it remains subject to the restraints of the Fourteenth Amendment just as the private utility in Public Utilities Comm'n v. Pollak, 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068, remained subject to the Fifth Amendment because of the surveillance which federal agencies had over its affairs.

This is not a case, such as James v. Pinnix, 495 F.2d 206 (5th Cir. 1974), in which the State has done no more than authorize private repossession of an item on which a creditor had a specific purchase money security interest. The present case is far closer to Hall v. Garson, 430 F.2d 430 (5th Cir. 1970), in which State action was found because the action of a private landlady in entering another's home and seizing another's property "was an act that possesses many, if not all, of the characteristics of an act of the State." *Id.* at 439. Here, as in *Hall,* Defendant has been vested with "authority that is normally exercised by the state and historically has been a state function." *Id.*

We note that Defendant's position in the present case is substantially different from that of other regulated providers of "private services," in that Southern Union is "the only gas company in town." Unlike merchants operating in a free market, Southern Union is not restrained in its actions and treatment of customers by the operation of a competitive market. Rather, because of governmentally granted insulation from competition, Defendant can present its customers with the choice of accepting its service or none at all. The only restraints imposed upon Defendant are those imposed by the City or State. While we do not rely upon the mere existence of this franchise monopoly form of subsidy granted Southern Union by the City in determining that Defendant has acted "under color of State law," *see* Public Utilities Comm'n v. Pollak, *supra,* we do recognize this as a factor leading to the necessarily pervasive nature of the City's "entwining" in the operation and control of Southern Union.

Notwithstanding the impressive body of case law finding the operation of a public utility under similar or less compelling facts to be "State action" and "under color of State law", Palmer v. Columbia Gas of Ohio, Inc., *supra*; Ihrke v. Northern States Power Co., *supra*; Salisbury v. Southern New England Telephone Co., *supra*; Bronson v. Consolidated Edison Co. of New York, *supra*; Hattell v. Public Service Co. of Colorado, *supra*; Stanford v. Gas Service Co., *supra*; Lamb v. Hamblen, *supra,* we feel compelled to analyze the possible impact of Moose Lodge No. 107 v. Irvis, *supra* on our analysis. After a careful review of the Supreme Court's opinion in *Moose Lodge* we are moved to the almost inescapable conclusion that the Court's position would have been different had the subject of analysis been a public utility rather than a private club. The carefully worded opinion of Mr. Justice Rehnquist distinguishes Burton v. Wilmington Parking Authority, *supra* as follows:

Here there is nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton,* where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of the building constructed for that purpose to commercial lessees such as the owner of Eagle Restaurant. Unlike *Burton,* the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accomodation, Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large. Nor is it located and operated in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State. In short, while Eagle was a public res-

taurant in a public building, Moose Lodge is a private social club in a private building.

*Moose Lodge, supra* 407 U.S. at 175, 92 S.Ct. at 1972.

The present case clearly falls within the analysis of *Burton* rather than *Moose Lodge.* The City and Southern Union have been clearly demonstrated to have a "symbiotic relationship." As in *Burton,*

> The State has so far insinuated itself into a position of interdependence with . . . (Defendant) that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Burton, supra,* 365 U.S. at 725, 81 S.Ct. at 862.

■■ Having decided that the Due Process Clause applies to Defendant's actions in terminating service to Plaintiff and the class she represents, we must turn to the questions of whether due process is afforded by Defendant's existing procedures and, if not, what remedy is available. "The fundamental requisite of due process of law is the opportunity to be heard." Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). The hearing must be "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The requirements of due process, of course, must be adapted to the circumstances at hand. Requirements of due process in the instant case can perhaps best be distilled from the standards enunciated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). "We cannot write a code of procedure. . . . Our task is limited to deciding the minimum requirements of due process." *Morrissey, supra* 408 U.S. at 488–489, 92 S.Ct. at 2604. In the present case we perceive them to be: 1) written notice of the grounds for termination; 2) opportunity to be heard in person and to present witnesses and documentary evidence prior to termination of service; 3) the right to be represented by retained counsel, though counsel need not be furnished; 4) the right to confront and cross-examine adverse witnesses; 5) a "neutral and detached" hearing officer, who need not be a judicial officer or lawyer, but who must not have participated in making the determination under review; 6) the decision-maker should state the reasons for his determination and indicate the evidence upon which he relied, though he need not make full written findings of fact or conclusions of law. The hearing need not involve formal legal rules of evidence, but the procedure should be sufficiently flexible to admit all material of probative value.

We are not prepared to state on the record before us that the "customer consultant" employed by Defendant is not sufficiently "neutral and detached" to satisfy the above-described requirements of due process. Indeed, his job description appears to provide the "customer consultant" with sufficient discretion to correct company errors, and it would appear that said job description could be easily modified by Defendant to comply with the requirements of due process set out herein. In the case of Plaintiff Limuel, and under prevailing practices of Southern Union, however, it is clear that the above-described minimum requirements of due process are not available to customers facing termination.

Thus, while we cannot write a "code of procedure" for Defendant, we can and do enjoin it from terminating service to Plaintiff or any other customer who wishes to contest the accuracy of his bill until said customer has been afforded the procedural rights above enumerated. We note that these procedures need not be implemented in full before every termination of service, but only when, after written notice of the grounds for termination has been pro-

vided, the customer to be terminated makes known his desire to contest the accuracy of grounds asserted as the basis for termination. It is accordingly

Ordered, adjudged and decreed that the termination policies of Defendant Southern Union Gas Company, both on their face and as applied, be, and hereby are, declared, pursuant to 28 U.S.C. § 2201, to violate the rights secured to Plaintiff Ethel Limuel and to others similarly situated by the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and that Defendant Southern Union Gas Company be, and hereby is, permanently enjoined from terminating gas service to Plaintiff Ethel Limuel or other customers who, after being provided with written notice of grounds for termination, make known to Defendant a desire to contest the accuracy of said asserted grounds, absent establishment and availability of procedures consistent with the requirements of due process set out herein.