**Catherine JACKSON, on behalf of herself and all others similarly situated, Appellant,**

**v.**

**METROPOLITAN EDISON COMPANY, a Pennsylvania corporation.**

**No. 72–1745.**

United States Court of Appeals, Third Circuit.

Argued May 4, 1973.

Decided Aug. 21, 1973.

Alan N. Linder, Tri-County Legal Services, York, Pa., for appellant.

Russell J. O'Malley, Paul A. Barrett, Nogi, O'Malley & Harris, Scranton, Pa., for appellee (Samuel B. Russell, Ryan, Russell & McConagley, Reading, Pa., of counsel).

James R. Adams, Edward J. Weintraub, Deputy Attys. Gen., for Com. of Pa., as amicus curiae.

Edward J. Dailey, National Consumer Law Center, Inc. as amicus curiae.

Jonathan M. Stein, I. David Pincus, David J. Ackerman, Philadelphia, Pa., Fellowship Commission's Committee on Consumer and Citizen Complaints, as amicus curiae.

Before HUNTER * and WEIS, Circuit Judges, and SCALERA, District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Whether the Civil Rights Act was violated when an electric utility shut off service to its customer is the issue to be decided in this case.

The defendant is a privately owned and operated Pennsylvania corporation, granted a monopoly to deliver electricity to the populace in the area of York, Pennsylvania. Like similar utilities in Pennsylvania, it is subject to the provisions of the Public Utility Code [1] and the regulations of the Public Utility Commission authorized by the Act.

The plaintiff was a residential customer of the Metropolitan Edison Company and in October of 1971 was claimed to have owed the defendant for past due bills. She disputed the validity of the charges, asserting that a former co-occupant of the premises was responsible for the amount due. Despite several tenders by the plaintiff of partial payments, the defendant terminated service on October 11, 1971 by disconnecting the line on the company's utility pole on the street near the plaintiff's house. The plaintiff then filed suit under the Civil Rights Act, 43 U.S.C. § 1983,[2] asking both damages and injunctive relief.

The district court held an evidentiary hearing on the request for a preliminary injunction. The plaintiff testified that on an occasion about a year previously when the electricity had been disconnected, she left her home for about 45 minutes to telephone the utility and when she returned, the power had been restored. She admitted not receiving bills in the ensuing year but claimed that one Dodson, the co-occupant of the house, had received and paid monthly statements from the defendant.

Although Dodson left the premises about August, 1971, the plaintiff admitted that no bills were received at her home thereafter. She testified that on October 6, 1971 a representative of Metropolitan came to the house inquiring

---

* Judge Hunter was present at the argument of this case but did not participate in the decision.

1. 66 Purdon's (Pennsylvania) Statutes §§ 1101 et seq.

2. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunity secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

about Dodson and on the following day another employee looked at the meter and told her that somebody had tampered with it. The plaintiff then asked that service be reinstated in the name of Robert Jackson. At the hearing she admitted that this was in fact her 12 year old son.

At the conclusion of the plaintiff's testimony and after the filing of briefs, the district court dismissed the case because there was not "a sufficient showing of state involvement in the complained of activity . . . ."[3]

The plaintiff asserts that the defendant's action in arbitrarily terminating service to her was under color of state law because:

1. As a utility, the defendant was closely regulated by the Commonwealth of Pennsylvania;

2. In supplying electricity, Metropolitan Edison was performing a governmental function;

3. The defendant was either acting as an agent for the state or a joint participant with it; and

4. The failure to act by the state amounted to "state action".

Litigation between utilities and their customers based on § 1983 has been the subject of decisions in the Courts of Appeals of the Eighth, Seventh, and Sixth Circuits, as well as a number of district courts. While on the facts the situations in the reported cases are capable of distinction, an objective appraisal might suggest that the differing results represent a continued uncertainty as to the application of the "color of state law" test.

The Supreme Court has frankly admitted the difficulty of drawing guidelines, and in Moose Lodge 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), Justice Rehnquist wrote:

"While the principle is easily stated, the question of whether particular discriminatory conduct is private, on the

one hand, or amounts to 'State action,' on the other hand, frequently admits of no easy answer. 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'"

While the *Moose* case was concerned with a private club rather than a utility, the following quote is helpful:

"The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from State conduct set forth in the *Civil Rights Cases, supra,* and adhered to in subsequent decisions."

The Supreme Court went on the discuss the multiform variety of control that the state exercised over the holder of a liquor license which the district court had described as "pervasive" and went on to say:

"However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise."

The Court thus recognizes the importance of a connection between the state regulation and the proscribed conduct.

Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961), presented a situation where the Court felt that a state agency which leased premises to a restauranteur became a joint-venturer or partner, in a sense, in the enterprise and therefore shared in the discriminatory policies of

3.  348 F.Supp. 954 (M.D.Pa.1972)..

the private concern. Furthermore, in that case the plaintiff could point to a specific state statute which was said to permit the offending conduct.

Adickes v. Kress, 398 U.S. 144, 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970), also was concerned with conduct of a private enterprise said to be in violation of § 1983. The Court there pointed out that the involvement of a policeman in a conspiracy situation provides the necessary ingredient of state action in a claim of violation of the Fourteenth Amendment, whether or not the actions of the officer were officially authorized. The Court also said:

> "Whatever else may also be necessary to show that a person has acted 'under color of [a] statute' for purposes of § 1983 . . . we think it essential that he act with knowledge of and pursuant to the statute." (At pp. 161, 162, f.n. 23, 90 S.Ct. at pp. 1598, 1611)

The Court noted also that a state is responsible for the discriminatory act of a private party if the state by its law has compelled the act.

Public Utility Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), found "state" involvement where the Commission after conducting hearings affirmatively approved the action which was held to be objectionable. The Court said very specifically and clearly:

> " . . . we do not rely on the mere fact that Capital Transit operates a public utility . . . Nor do we rely upon the fact that . . . Capital Transit now enjoys a substantial monopoly of street railway . . . "

*Pollak,* therefore, is not authority for the holding that the actions of a public utility which enjoys a monopoly, *ipso facto,* are those of a state agency, nor does it hold that all activities conducted under the auspices of a utility regulato-ry body satisfy the "color of state law" test.

Though it is difficult to summarize in this complex field and without intending to be all inclusive, it may be said generally that there may be a finding of state action or action under color of state law: [4]

1. When a private party's action occurred in conjunction with a business in which the state may be considered a partner or joint venturer in a profit making field (Burton v. Wilmington, *supra*); or

2. when a state statute or custom or usage compels the result (Adickes v. Kress, *supra*); or

3. when a state agency affirmatively orders or specifically approves the activity in the course of its regulatory rule making (Public Utility Commission v. Pollak, *supra*); or

4. when a private agency in effect is acting on behalf of and furnishing a typical government service (Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946)).

A brief discussion of the regulatory plan under which the defendant Metropolitan operates is helpful in deciding whether it falls within any of the categories outlined.

The rates which the defendant charges its customers are regulated by and must be approved by the Public Utility Commission. Additionally, the Commission is empowered to issue regulations necessary for supervision of utilities doing business in Pennsylvania, including provisions for inspection and access to facilities and records of the company as the Commission thinks necessary. The Commission is charged with prohibiting discriminatory practices in rates and services, and all rules and reg-

---

4. While it has been suggested that "state action" and "action under color of state law" are synonymous, U. S. v. Price. 383 U.S. 780, 794, f.n. 7, 86 S.Ct. 1152, 16 L.Ed. 2d 267 (1966), at least one court has indicated its belief that the "color of state law" test may be more demanding. Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972).

ulations of the utilities are subject to its approval.

As part of the rate-setting procedure, the utility must file a tariff with the Commission in compliance with its rules. The Commission Regulation on Tariffs, § VIII, provides that:

"Every public utility that [imposes] penalties upon its customers for failure to pay bills promptly shall provide in its filed tariffs a rule setting forth clearly the exact circumstances and conditions in which the penalties are imposed . . . ."

Pursuant to the regulation, the defendant filed in Tariff No. 41, its Rule 15 (issued April 30, 1971, effective June 30, 1971):

"Company reserves the right to discontinue its service on reasonable notice and to remove its equipment in case of non-payment of bills or violation of the Pennsylvania Utility Commission's or Company's rules and regulations; or, without notice, for abuse, fraud, or tampering with the connections, meters, or other equipment of company."

Since the record is silent on the point, we assume that no objection was raised to this particular provision of the tariff and, therefore, there was no hearing before the PUC which would have required affirmative action by that body such as occurred in the Pollak case.

While the tariff purports to give the company the right of re-entry upon the customer's premises for purpose of removing its equipment after termination of service, it seems clear from the record that such action was not taken in this case. The service was disconnected by the defendant at its pole, some distance removed from the home of the plaintiff.

Thus the action of the company in terminating service in this case was taken pursuant to its own regulations using its own personnel without entering onto the customer's private property, without utilizing any state statute or regulation permitting re-entry on the customer's premises, and without any specific direction or authorization of the regulatory body.

The factual background in this case is quite similar to that in Lucas v. Wisconsin Electric Power Company, 466 F.2d 638 (7th Cir. 1972), cert. denied, 409 U. S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973), where the Court of Appeals for the Seventh Circuit, sitting en banc, held that there had not been action under color of state law and said:

"The 'under color of' provision encompasses only such private conduct as is supported by state action. That support may take various forms, but it is quite clear that a private person does not act under color of state law unless he derives some 'aid, comfort, or incentive,' either real or apparent, from the state. Absent such affirmative support, the statute is inapplicable to private conduct.

"We believe that affirmative support must be significant, measured either by its contribution to the effectiveness of defendant's conduct, or perhaps by its defiance of conflicting national policy, to bring the statute into play (466 F.2d pp. 655, 656). . . . we believe the significance of that support must be evaluated to determine whether it brings § 1983 into play; otherwise the federal statute would soon supersede vast areas of state administrative regulation." (466 F.2d p. 657)

The Court concluded that the monopoly factor did not in a practical way deprive the customer of an effective remedy nor did it add the necessary state support to private conduct so as to transform an issue of state regulatory policy into a civil rights case.

The Court's action thus affirmed its earlier ruling in Kadlec v. Illinois Bell Telephone, 407 F.2d 624 (7th Cir. 1969), cert. denied, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95 and was consistent with Particular Cleaners v. Commonwealth Edison, 457 F.2d 189 (7th Cir. 1972). See also, Martin v. Pacific Northwest

Bell Telephone Co., 441 F.2d 1116 (9th Cir. 1971), where that Court said:

> "The fact that a private corporation, such as Pacific Bell, enjoys an economic monopoly which is protected and regulated by the state does not necessarily bring its every act within the purview of Section 1983. [citation], for as well stated in Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968), 'the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury.' "

In Palmer v. Columbia Gas Company, 479 F.2d 153 (1973), a panel of the Court of Appeals for the Sixth Circuit came to a contrary conclusion in a situation where the utility availed itself of a right of entry on the customer's property, that privilege having been granted by a state statute.[5]

The color of state law test was found to have been satisfied in Ihrke v. Northern States Power Company, 459 F.2d 566 (8th Cir. 1972), reversed on mootness, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed. 2d 72 (1972), where the city which regulated the utility also received 5% of the company's gross earnings. In that instance it might well be said that while the city did not collect the utility bills, it shared directly in them and to some extent was a joint venturer with the power company.[6]

While the Supreme Court in the *Moose Lodge* case refused to prohibit racial discrimination in a private club setting finding no state action in the extensive regulation of the Liquor Control Board, a differing result was reached in *Burton, supra,* where a public restaurant was involved but less state control was evident. It may well be that the underlying reasoning for the differing results in the two cases is that in *Moose Lodge* the national prohibition against racial discrimination had come into conflict with the fundamental right of free association, while in *Burton* the tension arose between discrimination and the freedom to operate a business which should have been open to the public at large. In this analysis, it is not at all clear that the result in *Moose Lodge* would not have been different had the discriminating defendant been a public utility rather than a private club.

It is important, therefore, that the issues here be considered not only on the premise of color of state law but that there be an examination and evaluation of the underlying federal rights of the parties, particularly those which the plaintiff espouses.[7] While the plaintiff and *amici* speak of utility service as being "indispensable to life and health" and termination of those services as depriving her of the very "means and necessities of life," we think those characterizations are extreme and serve only to becloud the real issues.[8]

Granted that in today's urban society the supply of electricity to a home does much to make life more comfortable and

---

5. The Lucas court placed emphasis upon the lack of entry upon the resident's premises and implied that its decision might have been different had the utility availed itself of the state statute to enter the customer's home in order to cut off the power.

6. *See also* Stanford v. Gas Service Co., 346 F.Supp. 717 (D.C.Kan.1972); Hattell v. Public Service Co. of Colorado, 350 F.Supp. 240 (D.C.Colo.1972); Bronson v. Consolidated Edison, 350 F.Supp. 443 (S.D.N.Y. 1972). The fact situations in many of the cases present instances of callous and overbearing conduct by personnel of large utilities, familiar examples of the abuse of authority by those who have little of it. Decisions in favor of the plaintiff in such instances carry strong emotional appeal but are not necessarily persuasive legal authority on the applicability of § 1983. We are not convinced that state courts or the PUC in Pennsylvania would not issue appropriate orders in such outrageous situations as those detailed in Bronson and Palmer, *supra.*

7. *See* Williams, The Twilight of State Action, 41 Texas L.R. 347 (1963).

8. *See* Abernathy, Expansion of the State Action Concept under the Fourteenth Amendment, 43 Cornell Law Quarterly 375, 405 (1958).

convenient, its absence in the usual situation does not pose an immediate threat to the life of the occupants. The fact that people, even today, manage to carry on their lives in isolated areas without electricity is proof enough of that.

There is a clear distinction between depriving a community of power where disastrous results might occur if hospital, water purification, and communications facilities were interrupted and the situation in a dwelling when the absence of electrical energy would require manual operation of furnace controls, illumination by kerosene lantern, or refrigeration by ice. We do not minimize the inconvenience of the absence of electrical service or deny that special circumstances may result in serious consequences but simply indicate doubt with the flat assertion that failure to provide this form of energy to a home is a threat to life itself. It is probably more accurate to say that the service is essential to the kind of life we are accustomed to, particularly in an urban society.

Furthermore, as convenient as this utility service is, as desirable as its continuation may be, and as dependent on it we may believe ourselves to be because of its availability and benefits, the fact remains that as of this time at least, the state is not obligated to furnish electricity without charge to its citizens.[9] Those who wish to avail themselves of it must pay for it.[10]

This premise the plaintiff does not dispute here, nor does she deny that if it is proved that she is mistaken in her position on the contested bill, she must pay it or do without electricity.

Clearly then, the right for which the plaintiff now contends is to continue to receive the service and, we assume, pay for it on a current basis until such time as a decision can be had on the disputed items.

The utility's response is that the plaintiff may pay the contested charge and then claim for a refund. This process, it is assumed, may be handled informally and perhaps without the necessity of going to court.[11] Though not explicitly stated as such, there is an underlying premise in plaintiff's position that because her income is limited to payments made by the Department of Public Welfare, the refund claim process is not a practical alternative to her. If we are to accede to this contention though, it should apply to every indigent person, not only as to past due bills, but current ones as well. While there may be argument that this would be a socially desirable development,[12] it has not yet been suggested as a constitutionally mandated one or one compelled by congressional enactment.

Plaintiff also asserts that she should be given reasonable notice before her service is terminated. But the defendant has already agreed with that proposition—its tariff provides that "reasonable notice must be given before termination."[13] She thus has been given that right which can be enforced in the state courts or by the Public Utility Commission—at certainly no more ex-

9. Shelton, The Shutoff of Utility Services for the Poor, 46 Washington L.R. 745, comments that the state of Washington by constitution and statute permits free service to indigents, but apparently there are no requirements that it in fact be done.

10. *See* the discussion in Michelman, The Supreme Court 1968 Term, Foreward: On Protecting the Poor Through The Fourteenth Amendment, 83 Harvard L.R. 7 (1969).

11. While it has been asserted that few of these cases result in litigation because of costs and the small amount involved, we point out that the district magistrates of Pennsylvania and the Small Claims Tribunals of the Common Pleas Court offer opportunities for the customer to present his case at little expense and without the necessity of employing counsel.

12. *See* Shelton, *supra*, f. n. 9.

13. Plaintiff has not raised in brief or argument any objection to the provision in the tariff reserving the right to discontinue without notice in the event that there has been tampering with the meter by the customer. Since there is no evidence that it is applicable here, we do not consider it.

pense or inconvenience than resort to the district court required.

Again, we note that the termination of the electricity did not occur until after the plaintiff had been contacted by two representatives of the defendant and had been made aware of irregularities in her account.

Essentially then, if the plaintiff is to prevail, she must establish that the procedure of suing for refund after payment of the amount claimed to be due is a violation of due process.

While this method of resolving disputes may be harsh and undesirable, we cannot say that it is unconstitutional. Flora v. United States, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960), discusses the history and procedures of collection of revenues due the United States which in many instances involves payment of the tax first and then filing a suit for refund. *See also* Great Lakes Dredge & Dock Company v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943), where the Court did not disapprove a similar procedure in a state tax collection matter.

There has never been any indication from the Supreme Court that this procedure does not comport with constitutional requirement of due process. The reason given for such drastic procedures, that is, that the revenue must be collected in order to keep the government in operation, is the very same argument the utilities invoke as grounds for requirement of payment before further service is rendered.

Plaintiff maintains, also, that because of its importance to everyday living, the right to receive utility service rises to the level of a constitutional

right or an entitlement from the state.[14] She cites Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), as expository of the doctrine that a person may not be deprived of a privilege or right by the state without a hearing. But while that case provides that the state is limited in the procedures that it may use to revoke or suspend an existing driver's license, there is no compulsion to issue one without payment of the customary fee. Moreover, we think that the wrong criterion has been applied. All of life's vital concerns have not been entrusted to the central government, and many, if not most, repose in the state or its agencies. Even so fundamental a human requirement as that of decent shelter has been said not to have a specific constitutional guarantee. Thus, in Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), the Court said:

"We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement."

The *Lindsey* case dealt with a summary form of eviction used in Oregon which required payment by the tenant in order to maintain possession and required that any defenses other than payment be reserved to a separate suit. Thus, it is akin to the theory used by the utility in this case, that is, pay first

14. The "entitlement" cases generally deal with a privilege or right conferred by the state of something which it alone can grant, e. g., in Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), only the state, not a private company, can issue a driver's license; only a state by appropriation and legislative action may administer and disburse welfare benefits, Goldberg v.

Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970). Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1971), was concerned with the effect of state statutes on the owner's right of possession of personalty. We do not believe that there is a property right to be furnished utility service without payment.

and litigate later. The Supreme Court in the *Lindsey* case found no constitutional objection to such a procedure.[15]

So, too, in San Antonio Independent School District v. Rodriguez et al., 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), a case dealing with the admittedly important role of education in our society, the Court said:

"But the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause."

And so, although the plaintiff's position has strong appeal, that is not enough to establish a constitutional basis. We must be alert to the fact that in granting a federal remedy to what is essentially a state problem, there is a further extension of. the power of the central government. Intervention is justified in some instances and indeed may be an absolute necessity at times, but such action should not be taken without recognizing the effect there may be upon the concept espoused by the framers of the Constitution that one of the best ways to prevent excessive and abusive government is to disperse its power among many entities and at various levels.

A reluctance, therefore, to enlarge the authority of the federal courts should not simply be viewed as a lack of appreciation for the rights of the individual but, rather, as an indication of concern for the most appropriate method of maintaining the proper balance between governmental power and the citizen's liberties.

Of course, much depends upon the circumstances, and in this case we find no overriding justification for utilization of the Civil Rights Act to intrude the federal courts into what is and should remain a state regulatory process.

Simply stated, we do not find that a right to receive utility service pending resolution of a dispute between a customer and the company is protected by the Constitution of the United States.

Thus, although we would find that there is no federally protected right involved here, we agree with the approach of the district court in applying a narrow view of the "color of state law" test in the weighing and sifting process in the circumstances of this case.[16] We find no error in the decision of the learned District Judge, and the judgment of the District Court, therefore, will be affirmed.

---

15. The fact that we find no constitutional prohibition to this procedure does not mean that we approve it or recommend it. If we were free to substitute our judgment for that of the PUC and the state legislature, we would require the utility to continue service on payment of current charges while the disputed matters are litigated and allow a time payment arrangement for financially distressed persons if necessary. Furthermore, if the utility is determined to be in error, an award of reasonable counsel fees to the customer would seem appropriate and equitable if employment of such professional service had become necessary.

16. *See also* Silas v. Smith, 361 F.Supp. 1187 (E.D.Pa.1973).