Johnnie Mae KOGER et al., Plaintiffs,

v.

Carmen F. GUARINO et al., Defendants.

Civ. A. No. 73–2365.

United States District Court,
E. D. Pennsylvania.

May 3, 1976.

Jonathan M. Stein, Andrew F. Erba, Community Legal Service, Philadelphia, Pa., for plaintiff.

Sheldon L. Albert, City Sol., James M. Penny, Jr., Asst. City Sol., Philadelphia, Pa., for defendant.

## MEMORANDUM

BRODERICK, District Judge.

Presently before the Court is the motion of the plaintiffs for partial summary judgment and their motion for class certification under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs Johnnie Mae Koger, Louis Steinbrecker, Anita Jackson, Arnelle Douglas and Wanda Harrison filed this class action on behalf of a class consisting of all customers of the Department of Water of the City of Philadelphia who have had their water service terminated or are threatened with termination of their water service without adequate due process procedures. Plaintiffs contend that the termination procedures of the Department of Water of the City of Philadelphia violate the Due Process Clause of the Fourteenth Amendment and seek declaratory and injunctive relief. Plaintiffs Johnnie Mae Koger, Anita Jackson, Arnelle Douglas and Wanda Harrison seek to represent a subclass of plaintiffs who are residents of the City of Philadelphia, whose water service has been terminated to their residence because of outstanding water and sewage bills owed by the owner of the premises. Plaintiff Louis Steinbrecker seeks to represent a subclass of all customers of the Department of Water who have contracted for water service and have or are threatened with the termination of water service without adequate due process.

Defendant Carmen F. Guarino is the Commissioner of the Water Department of the City of Philadelphia and is charged with the administration and enforcement of the ordinances and policies of the City of Philadelphia in connection with the city's water supply system; Defendant Thomas W. Rogers is the Commissioner of the Department of Collections of the City of Philadelphia, which Department is charged with the collection of all water and sewer bills; Defendant Hillel S. Levinson is the Managing Director of the City of Philadelphia and is charged with the supervision of the Water Commissioner; Defendant Frank L. Rizzo is the Mayor of the City of Philadelphia and is responsible for the administration of the City of Philadelphia. The City of Philadelphia is also a defendant.

Plaintiffs' complaint alleges in three counts that the defendants have (1) deprived them of their constitutional right to due process of law under the Fourteenth Amendment by terminating or threatening to terminate their water service without advance notice and an opportunity to contest the proposed termination in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983; (2) tortiously caused the plaintiffs to suffer severe emotional and mental distress by threatening to withhold water service from the plaintiffs is an abusive and harassing manner and with reckless disregard for the truth or merits of the defenses of the plaintiffs; and (3) denied the plaintiffs due process of law and equal protection of the laws in violation of the Fourteenth Amendment by threatening to terminate water service to tenants unless the tenant pays the landlord's past due water bill and by refusing future water service to tenants willing and able to pay for such service because the tenant declines to assume the landlord's liability for all unpaid water bills. In their motion for partial summary judgment, plaintiffs seek declaratory and injunctive relief under Counts I and III of their complaint. Plaintiffs seek to have this Court declare unconstitutional and enjoin the operation of Section 19–1606(2)(c) of the Philadelphia Code of General Ordinances, as applied by the defendants, which ordinance authorizes the city to terminate water service to a premises if the water bill is one year delinquent and the delinquent owner has been given ten days' notice of the impending termination. Plaintiffs also seek a

declaratory judgment that the defendants' policy of terminating water service to tenants because of a delinquency in the payment of a bill by a third party violates the due process and equal protection of the laws under the Fourteenth Amendment. Jurisdiction is properly invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(3) and (4). The declaratory relief sought by the plaintiffs is authorized by 28 U.S.C. § 2201 and § 2202.

This action was filed on October 23, 1973. The plaintiffs sought a Temporary Restraining Order in connection with the termination of water service to the plaintiffs Johnnie Mae Koger and Louis Steinbrecker. Pursuant to an agreement of counsel, the water service to these two named plaintiffs was maintained and the motion for a Temporary Restraining Order became moot. Settlement discussions began almost immediately, with all parties expecting that a satisfactory settlement could be reached. On December 4, 1973, the defendants filed a motion to dismiss. However, extensive settlement negotiations were conducted and on September 23, 1974, the Court entered an Order pursuant to Local Rule 23(b) dismissing the case pursuant to the reported agreement of the parties. The reported settlement was never finalized and on March 17, 1975, the Court held a hearing on the defendant's motion to dismiss, which motion was denied on March 20, 1975. On April 18, 1975, the Court held a hearing on the plaintiff's motion for partial summary judgment. The parties again entered into settlement discussions and the matter appeared close to settlement. However, no settlement was reached and the resolution of plaintiffs' motion is now necessary.

*Motion for Class Certification.*

The plaintiffs have made a timely motion pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure to certify this case as a class action pursuant to Rules 23(a) and 23(b)(2). The plaintiffs seek to represent all those individuals in the City of Philadelphia who have had their water service terminated, or are threatened with termination, without being afforded adequate due process. Additionally, the plaintiffs seek to represent two subclasses consisting of (1) all customers of the City of Philadelphia, Department of Water, who have contracted for water service and have had their water service terminated or are threatened with termination without adequate due process, and (2) those whose water service has been terminated or denied to their residence because of delinquent water bills owed by the owner of the premises.

Rule 23(a) sets forth certain prerequisites to the maintenance of a class action as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

We find, and the defendants do not contest, that the numerosity requirement of 23(a)(1) is met in this case. Further we find that there are questions of law or fact common to all members of the class within the meaning of 23(a)(2). The defendants contend, however, that the claims of the named plaintiffs are not typical of the claims of the class and for this reason, the representative parties will not fairly and adequately protect the interests of the class and therefore the plaintiffs have failed to meet the requirements of Rule 23(a)(3) and (4). In support of their position that the claims of the proposed class representatives are "antagonistic" rather than typical of those of the class members, the defendants cite *Ihrke v. Northern States Power Company*, 459 F.2d 566 (8th Cir.) *rev'd on grounds of mootness*, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972). In *Ihrke*, the plaintiffs sought an order declaring that the rules and regulations of the utility were unconstitutional in that they permitted termination of utility service without adequate prior notice and hearing. The Court held that the trial

court had not erred in refusing to allow the lawsuit to be maintained as a class action by stating:

> It is possible that all such persons who are actual subscribers would share the desire of the Irhkes for a change in the rules and regulations which would require adequate notice prior to termination of their utility service. But it is highly unlikely that the claim of the Ihrkes that a hearing should be required after notice and prior to termination, is typical of the claims of the class. It is likely that some customer of Northern would feel that the additional expense of such procedure, if it is indeed required, could conceivably result in a rate increase to all customers, and this certainly would not be considered desirable by all the subscribers of Northern. 459 F.2d at 572–73.[1]

This reasoning has not, however, been followed by the majority of courts which have allowed utility termination cases to be maintained as class actions. *Davis v. Weir*, 497 F.2d 139, 146–47 (5th Cir. 1974); *Palmer v. Columbia Gas Company*, 342 F.Supp. 241 (N.D.Ohio 1972) *aff'd* 479 F.2d 153 (4th Cir. 1973); *Limuel v. Southern Union Gas Co.*, 378 F.Supp. 964 (W.D.Texas 1974); *Lamb v. Hamblin*, 57 F.R.D. 58 (D.Minn. 1972); *Stanford v. Gas Service Company*, 346 F.Supp. 717 (D.Kansas 1972). In *Cottrell v. Virginia Electric & Power Co.*, 62 F.R.D. 516, 520 (E.D.Va.1974), a suit alleging that the termination of electrical service without adequate notice and a prior evidentiary hearing violated the plaintiff's due process rights under the Fourteenth Amendment, it was stated that:

> There are diverse issues of fact in all class actions. The individual members of a class will invariably reach an adversary posture with the defendant in different

ways. But Rule 23(a)(3) does not require that the factual background of the named plaintiff's case be identical with that of other members of the class, but that the disputed issue occupy essentially the same degree of centrality to the named plaintiffs' claim as to that of other members of their purported class. The Cottrells allege they were denied an opportunity for a hearing prior to termination and that such denial is unconstitutional. The sole relevant factual assertion is not only typical of the members of the purported class, it defines them. And for each the simple legal claim deriving from that fact is the same. The Cottrells' claim, for purposes of this suit, is not only typical of, but identical to the claims of the purported class.

> Finally, in this regard, " 'Typicalness' is not a subjective test, authorizing a judge to dismiss a class action based on a substantial legal claim where he thinks some members of the class may prefer to leave the violation of their rights unremedied." But it was exactly this erroneous interpretation of the term that was applied in *Ihrke v. Northern States Power Co.* (Citations omitted).

We therefore find that the fact that the class may contain individuals who are indifferent or even opposed to the class relief sought by the named plaintiffs does not mean that the claims of the named plaintiffs are not typical of those of the class or that they will not fairly and adequately protect the interests of the class. Wright, *Federal Courts*, 309 (2d ed. 1970).[2]

■ The plaintiffs must, in addition to meeting the requirements of Rule 23(a), meet the test of Rule 23(b)(2) which reads:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

---

1. At least one other court has questioned whether a utility termination case is appropriate for class action treatment on the basis of the Ihrke reasoning. *Lucas v. Wisconsin Electric Power Company*, 466 F.2d 638, 644 (7th Cir. 1972), cert. denied 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696.

2. In *Davis v. Weir*, 497 F.2d 139, 147 (5th Cir. 1974), the Court rejected the argument that a class action was inappropriate in a case against a utility alleging similar due process violations and stated "antagonistic interests within a class can be eliminated by realigning the cause into subclasses that are defined congruently with the substantive issues at hand."

(2) [T]he party opposing the class has acted or refuses to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

The named plaintiffs were aggrieved by and seek to invalidate the Department's refusal to provide adequate notice and a hearing before their water service is terminated. The defendants have displayed a similar unwillingness to act with respect to all users of their water service. Therefore, common to all class members is the defendant's refusal to implement adequate due process procedures before their water service is terminated. Although the individual circumstances of each situation may vary, the defendants' refusal to provide sufficient due process procedures is the same in every instance. We, therefore, find that the requirement of Rule 23(b)(2) has been satisfied.

Finally, defendants argue that the proposed class is overly broad. We find this contention to be without merit. The plaintiffs' class is defined by the issue raised, i. e., that the defendants' refusal to provide water users adequate due process procedures prior to termination of water service and the denial of water service to tenants because of delinquent water bills owed by the owner of the premises is a denial of due process under the Fourteenth Amendment. We will therefore certify this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. We have determined that we will certify the class as consisting of all users of water in the City of Philadelphia who have had their water service terminated or are threatened with such termination without adequate due process procedures. Finally, because of the issue raised by the plaintiffs in Count III of the complaint and because of the somewhat different circumstances presented in the case of tenants who are denied water service to their residence because of delinquent water bills owed by the owner of the premises, we will certify them as a subclass.

*Procedural Due Process.*

In support of their motion for partial summary judgment, the plaintiffs have submitted the affidavits of the plaintiffs Louis Steinbrecker and Johnnie Mae Koger together with the depositions of Kenneth Carlin, the assistant revenue commissioner for the City of Philadelphia, Joseph F. McCrossen, Linda Ruffin and Ann Elizabeth Miller, employees of the Department of Collections of the City of Philadelphia. The plaintiffs have also submitted as facts allegations of plaintiffs Anita Jackson, Arnelle Douglas and Wanda Harrison, which factual allegations have been admitted by the defendants. In support of their opposition to the plaintiffs' motion, the defendants have submitted the affidavit of Kenneth Carlin.

In a motion for summary judgment, all doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *First Pa. B. & T. Co. v. United States Life Ins. Co.,* 421 F.2d 959, 962 (3d Cir. 1969). As stated in 6 *Moore's, Federal Practice,* ¶ 56.15[3], at 56–463 to 467:

The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to judgment as a matter of law.

The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. (Footnotes omitted).

Under Rule 56, once a properly supported summary judgment motion is made, an adverse party may not rest upon the mere allegations of his pleading. His response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if otherwise appropriate, shall be entered against him. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–290, 88 S.Ct.

1575, 1592–93, 20 L.Ed.2d 569, 591–93 (1968); *Chapman v. Rudd Paint & Varnish Company*, 409 F.2d 635, 643–644 (9th Cir. 1969). Accordingly, we have drawn all inferences favorable to the defendants and have accepted their version of the facts where a conflict exists. We find that there is no genuine issue of material fact and that the plaintiffs are entitled to summary judgment as a matter of law.

Section 19–1606(2)(c) of the Philadelphia Code of General Ordinances authorizes termination of water service after a bill remains unpaid for one year in the following language:

> If any water or sewer rent charge remains unpaid for two cycles after the bill has been rendered, the Department [of Collections] shall serve a notice upon the delinquent property owner and if the charge, with penalties thereon, is not paid within 10 days after such service, the Department may, in its discretion, deprive the premises of water until the charge with penalties is paid.

Pursuant to the above quoted ordinance, the Department of Collections has developed procedures for the collection of delinquent water bills. Water bills are currently issued on a six month cycle with no attempt to collect delinquent bills being made until the water bill is two or more cycles delinquent. When a customer is delinquent by two cycles in the payment of his water bills, he receives with his bill a notice that he may have his water service shut off and that he should pay his bills promptly. If, after this notice, the bills are not paid and a determination is made that the water service should be terminated, a shut off notice is hand delivered to the premises. If no one is at the residence, the shut off notice is deposited on the premises with no further attempt to personally serve the notice. This notice, which is left at the premises, advises that the water service will be terminated on a specified date unless the delinquent bills are paid. A telephone number of a person in either the customer relations or the enforcement department is typed on the shut off notice. The recipient of the shut off notice may call this telephone number for information. If the number is called, the caller is informed by a collection representative that 50% of the delinquency must be paid immediately and that arrangements must be made to pay the balance, otherwise the water will be turned off.[3] The collection department has, however, established a "hardship" classification for water users. The policy in "hardship" cases is that less than the 50% payment will be accepted. Also, if the water user is determined to be a "hardship", a more lenient payment schedule is arranged for payment of the balance of the delinquent bills. The Department of Collections has no set of standards by which it determines a "hardship". The determination of a hardship is made by the "investigator" who attempts personal delivery of the shut off notice to the premises or by the customer representative who receives the telephone call after delivery of the shut off notice. The collection representative or the investigator makes an individual determination as to whether a "hardship" exists in particular cases without the use of any official standards. There is evidence that no one is charged with the duty to make a determination as to whether the caller is a "hardship" case.

Although the Department of Collections recognizes that a tenant may not have been responsible for the payment of water bills, the Department will nevertheless terminate the water service to a premises if no one pays the delinquent water bills within ten days of the shut off notice. In order to retain the water service in the event the landlord, who has contracted with the city to provide water service for the premises, does not pay the bill, the tenant must pay 50% of the outstanding bills and make arrangements to pay the balance.[4] This poli-

---

**3.** There are instances in which less than 50% of the delinquent bills will be accepted. However, the standard instruction given to the collection customer relations representative is to inform the caller that 50% of the delinquent bills must be paid by the date shown on the notice to avoid termination.

**4.** There were vague references in Mr. Carlin's deposition about a changing city policy to ter-

cy prevails even if the tenant may have used only a portion of the water for which the landlord is delinquent, or the delinquent bills resulted from water use occurring prior to the tenant's occupancy of the premises.

Plaintiff Louis Steinbrecker is a ninety-two year old shut-in living in the residence which he owns at 1234 Frankford Avenue in Philadelphia. At all times relevant to this lawsuit, the plaintiff received and depended upon water service from the Water Department of the City of Philadelphia. Prior to September 1, 1973, Mr. Steinbrecker subsisted on a semi-monthly grant from the County Board of Assistance in the amount of $57.00. After September 1, 1973, Mr. Steinbrecker began receiving a social security pension in the amount of $93.00 per month. Since 1971, Mr. Steinbrecker has been severely pressed financially and has incurred debts for his necessary household and medical needs and has not been able to keep current on all his bills, including his water bills. On September 1, 1973, Mr. Steinbrecker received a notice from the Department of Collections for the City of Philadelphia which stated that he had overdue water bills in the amount of $192.58 and that his water service would be terminated on September 15, 1973 unless he paid the outstanding bills. Mr. Steinbrecker, through his attorney at Community Legal Services, requested that because of his impecunious state he not be required to make the required 50% payment to avoid the termination of his water service. Mr. Steinbrecker was given a six week extension within which to pay 50% of his outstanding bills in order to avoid termination of his water service. Mr. Steinbrecker was unable to meet this 50% payment after the six week period and on October 9, 1973, his water service was terminated. Mr. Steinbrecker alleges that had he been afforded a hearing prior to the termination of his water service, he would have been able to establish his hardship status and would not have had his water service terminated.

In October of 1959, plaintiff Johnnie Mae Koger entered into a month to month lease with the Bell-Stoifer Realty Company, which was the agent for John M. Rider, the owner of 1118 North 21st Street in Philadelphia, whereby the plaintiff agreed to pay $63.00 per month to rent the above property. Pursuant to the terms of the lease, the owner was to provide both heat and water service. From 1959 until 1971, Ms. Koger paid her monthly rent to Bell-Stoifer Realty Company. In 1971, John M. Rider, plaintiff's landlord, began to collect the rents for the above named property personally. In February 1973, plaintiff's landlord failed to appear to collect the rent and Ms. Koger was forced to apply the rent to her heating bills. On or about September 30, 1973, an employee of the Department of Collections of the City of Philadelphia presented Ms. Koger with a delinquent water bill in the amount of $434.40 Several days later, Ms. Koger received a notice stating that her water service would be terminated on October 15, 1973, unless she paid $434.40 to the City before that date. This notice contained a telephone number to call "for information". Upon calling the number listed, Ms. Koger was told that she would have to pay 50% of the bill in order to retain her water service. Through her attorney, who worked for Community Legal Services, Ms. Koger was able to negotiate an extension until October 29, 1973, within which to pay the outstanding water bills on the premises. However, in October of 1973, Ms. Koger was living on a semi-monthly grant from the County Board of Assistance in the amount of $114.00 and a monthly Social Security grant earmarked for her three children in the amount of $103.00. Ms. Koger contends that she was entitled to a hearing at which she could establish that she was not liable for the water bills on the property and that she should have the right to contract with the city for future water service for the premises.

Plaintiffs Anita Jackson, Arnelle Douglas and Wanda Harrison are tenants residing at

---

minate water service to tenants only in the situation where there are four or more units in a tenant-occupied property. However, neither party presented any argument in connection therewith.

221 South 50th Street, Philadelphia, Pennsylvania under a lease with John Green. Under the terms of the lease, the landlord was responsible for supplying water service to the tenants. On October 23, 1973, without prior notice to the plaintiffs, their water service was terminated by the defendants. The plaintiffs were told by the defendants that to obtain water service, the plaintiffs would have to enter into a payment arrangement with the Department of Collections for the entire amount of the delinquent water bills.

The plaintiffs contend that their entitlement to water service is a right protected by the Due Process Clause of the Fourteenth Amendment and by 42 U.S.C. § 1983.[5] There are two essential elements to a cause of action under 42 U.S.C. § 1983. In *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142, 150 (1970), the United States Supreme Court stated:

> The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory." This second element requires that the plaintiff show that the defendant acted "under color of law."

There is no controversy as to whether the defendants have acted under color of state law within the purview of Section 1983 or whether their activities constitute state action within the ambit of the Fourteenth Amendment. The Water Department is a department of the municipal government of the City of Philadelphia and the individual defendants are all municipal employees or elected officials admittedly subject to the proscription of the constitutional and statutory provisions. The issue to be resolved therefore, is whether the defendants' termination of water service deprived the members of the plaintiff class of any "rights, privileges, or immunities secured by the Constitution and laws." The plaintiffs assert that they have a property interest or entitlement to continued water service which is protected by the Fourteenth Amendment and of which they cannot be deprived without due process of law. The defendants contend that the "rights" allegedly violated by the defendants are not federally-protected rights to which the proscriptions of the Due Process Clause attach. It is beyond doubt that property rights are protected by the Fourteenth Amendment and violations thereof can be redressed by suit under 42 U.S.C. § 1983. *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

The defendants rely on the Third Circuit Court of Appeals decision in *Jackson v. Metropolitan Edison Co.*, 483 F.2d 754 (1973), *aff'd* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). However, a careful reading of the Circuit Court's opinion in *Jackson* reveals that the Court specifically held that the district court had not erred in dismissing the complaint on the ground that Metropolitan Edison Corporation did not act "under color of state law."[6] The narrowness of the Court of Appeals decision is emphasized by the fact that the Supreme Court, in affirming the Third Circuit's *Jackson* ruling, analyzed only the state action question, without discussing whether the

---

**5.** 42 U.S.C. § 1983 reads as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and Laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**6.** The Court stated:

Thus, although we would find that there is no federally protected right involved here, we agree with the approach of the district court in applying a narrow view of the "color of state law" test in the weighing and sifting process in the circumstances of this case. 483 F.2d at 762.

termination of a utility service constitutes the termination of a property interest to which the proscriptions of the Due Process Clause of the Fourteenth Amendment attach. The Supreme Court stated "We therefore have no occasion to decide whether petitioner's claim to continued service was 'property' . . . or whether 'due process of law' would require a State taking similar action to accord petitioner the procedural rights for which she contends." 419 U.S. at 359, 95 S.Ct. at 457; 42 L.Ed.2d at 488.[7] The defendants, however, contend that the right to receive water service is not one of the property rights protected by the Fourteenth Amendment. They place reliance upon the following language in *Jackson:*

> While the plaintiff and *amici* speak of utility service as being "indispensable to life and health" and termination of those services as depriving her of the very "means and necessities of life," we think those characterizations are extreme and serve only to becloud the real issues.
>
> Granted that in today's urban society the supply of electricity to a home does much to make life more comfortable and convenient, its absence in the usual situation does not pose an immediate threat to the life of the occupants. The fact that people, even today, manage to carry on their lives in isolated areas without electricity is proof enough of that.
>
> There is a clear distinction between depriving a community of power where disastrous results might occur if hospital, water purification, and communication facilities were interrupted and the situation in a dwelling when the absence of electrical energy would require manual operation of furnace controls, illumination by kerosene lantern, or refrigeration by ice. We do not minimize the inconvenience of the absence of electrical service or deny that special circumstances may result in serious consequences but simply indicate doubt with the flat assertion that failure to provide this form of

energy to a home is a threat to life itself. It is probably more accurate to say that the service is essential to the kind of life we are accustomed to, particularly in an urban society.

\*     \*     \*     \*     \*     \*

> Simply stated, we do not find that a right to receive utility service pending resolution of a dispute between a customer and the company is protected by the Constitution of the United States. 483 F.2d at 759–760 (footnote omitted).

It is the position of the defendants that the above quoted passages are dispositive of the issues raised in this case, i. e., that termination of water service is not a property interest to which due process applies. The plaintiffs contend that the Third Circuit's language in *Jackson,* quoted above, is dicta. In any event, we are of the opinion that the termination of water service should be considered as "indispensable to life and health" and not simply a mere convenience of today's urban society. Even in isolated areas people cannot carry on life without water.

The Supreme Court's recent decision in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), specifically dealt with the nature of the property interests which are protected by the Due Process Clause of the Fourteenth Amendment. In *Goss,* the Supreme Court, in holding that students could not be suspended from school for a period of ten days or less without prior procedural safeguards stated:

> At the outset, appellants contend that because there is no constitutional right to an education at public expense, the Due Process Clause does not protect against expulsions from the public school system. This position misconceives the nature of the issue and is refuted by prior decisions. The Fourteenth Amendment forbids the State to deprive any person of life, liberty or property without due process of law. Protected interests in property are normally "not created by the Constitution. Rather, they are created and their

---

**7.** Moreover, the district court opinion, which was appealed to the Third Circuit, deals exclusively with the state action issue, the only issue

raised before that court. 348 F.Supp. 954 (M.D.Pa.1972).

dimensions are defined" by an independent source such as state statutes or rules entitling the citizen to certain benefits.

Accordingly, a state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process. *Connell v. Higginbotham,* 403 U.S. 207 [91 S.Ct. 1772, 29 L.Ed.2d 418] (1971); *Wieman v. Updegraff,* 344 U.S. 183, 191–192 [73 S.Ct. 215, 97 L.Ed. 216] (1952); *Arnett v. Kennedy,* 416 U.S. 134, 164 [94 S.Ct. 1633, 40 L.Ed.2d 15] (Powell, J., concurring), 171 (White, J., concurring and dissenting) (1974). So may welfare recipients who have statutory rights to welfare as long as they maintain the specified qualifications. *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970). *Morrissey v. Brewer,* 408 U.S. 471 [92 S.Ct. 2593, 33 L.Ed.2d 484] (1972) applied the limitations of the Due Process Clause to governmental decisions to revoke parole, although a parolee has no constitutional right to that status. In like vein was *Wolff v. McDonald,* 418 U.S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974), where the procedural protections of the Due Process Clause were triggered by official cancellation of a prisoner's good-time credits accumulated under state law, although those benefits were not mandated by the Constitution.

Here on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education. . . . Having chosen to extend the right to an education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred. *Arnett v. Kennedy, supra,* 416 U.S. at 164 [94 S.Ct. 1633] (Powell, Jr., concurring), 171 (White J., concurring and dissenting), 206 (Marshall, J., dissenting).

Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend. Those young people do not "shed their constitutional rights" at the schoolhouse door. *Tinker v. Des Moines Community School Dist.,* 393 U.S. 503, 506 [89 S.Ct. 733, 21 L.Ed.2d 731]. "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia v. Barnette,* 319 U.S. 624, 637 [63 S.Ct. 1178, 87 L.Ed. 1628] (1943). The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that clause.

\*    \*    \*    \*    \*    \*

Appellants proceed to argue that even if there is a right to a public education protected by the Due Process Clause generally, the clause comes into play only when the State subjects a student to a "severe detriment or grievous loss." The loss of 10 days, it is said, is neither severe nor grievous and the Due Process Clause is therefore of no relevance. Appellants' argument is again refuted by our prior decisions; for in determining "whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." *Board of Regents v. Roth, supra* [408 U.S. 564], at 570–571 [92 S.Ct. 2701, at 2705–2706, 33 L.Ed.2d 548]. Appellees were excluded from school only temporarily, it is true, but the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, "is not decisive of the basic right" to a

hearing of some kind. *Fuentes v. Shevin,* 407 U.S. 67, 86 [92 S.Ct. 1983, 32 L.Ed.2d 556] (1972). The Court's view has been that as long as a property deprivation is not *de minimis,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause. *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 342 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969) (Harlan, J., concurring); *Boddie v. Connecticut,* 401 U.S. 371, 378–379 [91 S.Ct. 780, 28 L.Ed.2d 113] (1971); *Board of Regents v. Roth, supra,* at 570, n. 8 [92 S.Ct. 2701]. A 10-day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause. 419 U.S. at 572–576, 95 S.Ct. at 735–737, 42 L.Ed.2d at 733–736.

Again, in *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18, 31 (1976), the Supreme Court, addressing itself to the termination of social security disability benefits stated:

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments. The Secretary does not contend that procedural due process is inapplicable to terminations of social security disability benefits. He recognizes, as has been implicit in our prior decisions, that the interest of an individual in continued receipt of these benefits is a statutorily created "property" interest protected by the Fifth Amendment. (Citations omitted).

We therefore conclude that a water user has a "legitimate claim of entitlement" to continued water service which is a property interest to which the Due Process Clause of the Fourteenth Amendment applies. Although the defendants are not constitutionally obligated to establish and maintain water service for the benefit of their citizens, once having done so, a user has a legitimate claim of entitlement to continued service absent sufficient cause for termination consistent with the procedural protections of the Due Process Clause. Certainly, the right to receive water service is not a *de minimis* property interest. While the ramifications of termination of water service and the effect upon the defendants of providing due process will be factors which will be taken into consideration in determining the ultimate relief to which plaintiffs are entitled, this does not affect the fact that water service is an entitlement to which the requirements of due process attach. *Bell v. Burson,* 402 U.S. 535, 540, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90, 95 (1971).[8] Indeed, many courts which have considered the issue have agreed that utility users possess a constitutionally protected interest in continued utility service, and therefore may not be deprived of service without due process of law. *Craft v. Memphis Light, Gas and Water Division,* 534 F.2d 684 (6th Cir. 1976); *Palmer v. Columbia Gas of Ohio, Inc.,* 479 F.2d 153 (6th Cir. 1973); *Condosta v. Vermont Electric Cooperative, Inc.,* 400 F.Supp. 358 (D.Vt.1974); *Donnelly v. City of Eureka,* 399 F.Supp. 64 (D.Kan.1975); *Limuel v. Southern Union Gas Co.,* 378 F.Supp. 964 (W.D.Texas 1974); *Davis v. Weir,* 328 F.Supp. 317 (N.D.Ga.1971), aff'd 497 F.2d 139 (5th Cir. 1974); *Bronson v. Consolidated Edison Co. of New York, Inc.,* 350 F.Supp. 443 (S.D.N.Y.1972); *Hattell v. Public Service Company of Colorado,* 350 F.Supp. 240 (D.Colo.1972); *Lamb v. Hamblin,* 57 F.R.D. 58 (D.Minn.1972); *Stanford v. Gas Service Co.,* 346 F.Supp. 717 (D.Kan.1972).

Having determined that due process applies, the question becomes whether the procedures adopted by the defendants in connection with the termination of water service to users comply with the Due Process Clause of the Fourteenth Amendment. "[T]he interpretation and application of the

---

**8.** In *Bell v. Burson, supra,* the Supreme Court held that the state cannot suspend a driver's license without a preliminary determination that there is a reasonable possibility of a judgment in the amounts claimed against the licensee.

Due Process Clause are intensely practical matters"[9] and "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."[10] The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner,"[11] a right that "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest."[12] As the Supreme Court stated in its recent decision in *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976):

This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of criminal conviction, is a principal basic to our society." (Citations omitted).

The Supreme Court then set forth the following guidelines to determine whether the procedures adopted by the state comply with the Due Process Clause.

[R]esolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 334, 96 S.Ct. at 903, 47 L.Ed.2d at 33 (Citations omitted).

The record in this case reveals that when a decision to terminate water service to a customer is made, after the bill is delinquent for at least one year,[13] an "investigator" is sent to the property to hand deliver a shut off notice. The investigator attempts to deliver the notice personally to the occupant but if unable to do so, the investigator posts the notice on the premises. The notice states that payment must be received within a specified period of time or water service will be terminated. This notice also contains an endorsement which provides a telephone number which can be called if the recipient of the notice has any questions. The notice does not provide that a hearing may be requested at which the validity of the termination can be established. Indeed, this record establishes that no pre-termination hearing is provided. If the recipient of the shut off notice calls the telephone number listed on the notice, the record shows that in the vast majority of cases he will be told by a collection representative that to prevent the shut off of water service to the premises 50% of the delinquent bill must be paid and arrangements made to pay the balance. The only exception to this procedure is in the case of "hardship." However, there are no uniform standards for determining whether a particular situation is a "hardship." A determination that "hardship" exists is made on the basis of the information, if any, received by the investigator when he delivers the shut

9. *Goss v. Lopez,* 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975).

10. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961).

11. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965).

12. *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950).

13. Defendants have stated that they are in the process of phasing their collection procedures from a three cycle enforcement system to a two cycle enforcement.

off notice, or on the basis of information received by the collection representative over the telephone, provided such a call is made. A review of the record, which includes the depositions of two collection representatives, establishes that those who receive such telephone calls make no attempt to advise the càller that one may apply for a "hardship" determination or receive a hearing concerning the validity of the shut off.

The defendants point out that a person receiving a water bill may within 60 days of the date of the mailing of such bill petition the Tax Review Board for a review of the amount of the bill or one's liability therefor.[14] However, this procedure before the Tax Review Board is not available after the expiration of the 60-day period and is not directly related to the defendant's "shut off" procedures. The only method available to a water user threatened with shut off to obtain a formal review of any kind is to pay the delinquent water bills and petition for a refund pursuant to § 19–1703 of the Philadelphia Code.[15] Tenants who are not liable to the defendant for water bills are thus required to pay all delinquent water bills for the premises or suffer the consequence of a shut off. Tenants who do not have the

funds to pay delinquent water charges or do not consider it feasible to pay all the delinquent water bills are, as a practical matter, forced out of their homes and required to find new living accommodations. With the water "shut off" the City is faced with another abandoned premises.

■ An analysis of the three factors enunciated recently in *Mathews, supra,* establishes that the pre-termination procedures employed by the defendants are inadequate to satisfy the requirements of the Due Process Clause. First, the private interest affected by termination of water service is substantial. Water is a necessity of life. *Lamb v. Hamblin,* 57 F.R.D. 58, 61 (D.Minn.1972); *Davis v. Weir,* 328 F.Supp. 317 (N.D.Ga.1971). While termination of electrical power may not render a premises unfit for habitation, *see Jackson v. Metropolitan Edison Company,* 483 F.2d 754 (3d Cir. 1973), an urban home without water and sewage is not fit for human habitation. Indeed, water is an absolute necessity of life and we cannot envision any more serious individual consequences than those which flow from its deprivation.

The defendants are the only source of water supply in the City of Philadelphia,

---

**14.** Philadelphia Code § 19–1702(1) provides:

(1) Every petition for review of any decision or determination relating to the liability of any person for any unpaid money or claim collectible by the Department of Collections including, but not limited to, any tax, water or sewer rent, license fee or other charge, and interest and penalties thereon, shall be filed with the Tax Review Board within 60 days after the mailing of a notice of such decision or determination to the petitioner.

**15.** Philadelphia Code § 19–1703(1) provides:

(1)(a) The Department of Collections may grant a refund, in whole or in part, upon determination that a tax, water or sewer rent, license fee or other charge, interest or penalty, or any part thereof, has been paid under mistake of law or fact, or under an invalid law.

(b) Every petition for refund of moneys collected by the Department of Collections including but not limited to any tax, water or sewer rent, license fee or other charge, and interest and penalties thereon, shall be filed with the Department of Collections within 6 years from the date of payment to the City.

(2) Every petition for refund shall state the reasons upon which the petitioner relies and shall include a certification by the petitioner that the facts set forth therein are true.
Philadelphia Code § 19–1703(4) and (6) provide:

(4) A decision of the Department of Collections granting a refund in whole or in part shall become final only after it has been reviewed, approved, and/or modified by the Tax Review Board; provided that such review and approval is not required where the Department grants a refund because of an overpayment resulting from duplication of payments or mathematical error in computation or other mechanical error such as a typographical error.

(6) Before the Tax Review Board disapproves or modifies any refund granted by the Department of Collections, it shall afford the petitioner and the Department a hearing before the Board.

having assumed the obligation to provide such service.[16] An urban residence usually does not have an alternate source of water and sewage service. Moreover, as heretofore pointed out, once water service is terminated there is no method of restoring service short of paying the water bill. Unlike the situation in *Mathews v. Eldridge, supra* (termination of disability income payments) and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of welfare benefits), a water user's concern in continual water service cannot be rectified by future payments of deprived benefits. Certainly, the consequence which flows from the termination of water service exceeds the deprivations which may flow from the seizure of other consumer goods.[17]

The second factor to be considered in determining the adequacy of the current pre-termination procedures is "the risk of an erroneous deprivation of such interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33. The risk of an erroneous deprivation of water service is particularly evident in this computer age. We are all aware of the errors which occur in connection with mass billing procedures and the time it takes to rectify such errors. The consequences of a possible erroneous deprivation should not depend upon the making of a telephone call. Minimal additional safeguards are necessary to eliminate the risk of an erroneous deprivation of water to an occupied premises.

The final factor to be considered in determining whether the defendants' water service termination procedures meet with the requirements of due process is the interest of the city in prompt and efficient collection for water sold and delivered. There is no question that additional procedural safeguards will result in some additional burden upon the defendants. On the other hand, there may be additional benefits to the defendants in setting up procedures which would enable tenants to pay for current water service. Furthermore, the prospect of residences being abandoned because of the shut off of water and sewer services may be lessened. In view of the fact that the present procedures do not provide the water user with an effective process for asserting his claim prior to termination of a necessity of life in the urban community, any increased governmental burden it outweighed by the potential loss from wrongful termination. *Bell v. Burson,* 402 U.S. 535, 540–41, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90, 95 (1971).

Defendants argue that since a water user may pay all delinquent water bills and sue for a refund, after which a hearing is held, the requirements of due process are met. We do not agree that such a procedure provides sufficient due process in connection with the termination of water service. Due process requires a hearing prior to the termination of an essential service such as water and sewer and making the payment of all delinquent water and sewer bills a condition precedent to a hearing is not sufficient. A user who does not pay the delinquent water bills does not, as we have heretofore pointed out, receive any due process hearing even after the termination of water service.[18] As the Su-

---

16. Section 5–800 of the Philadelphia Home Rule Charter establishes the Water Department to operate the City's water supply and sewage disposal system. The City of Philadelphia is not precluded from creating an authority or from contracting with a private operator to perform all the operations of the Water Department. The Council may abolish the Water Department if all of its functions are turned over to an authority or private operator. Philadelphia Home Rule Charter, § 5–800. However, the City of Philadelphia has elected to provide

water service to its citizens through its Water Department.

17. In *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court said that more is required in a replevin suit than in an *ex parte* proceeding before a court clerk.

18. *Cf. Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), where the disability claimant has the right to a prompt hearing before a social security administrative law

preme Court stated in *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90, 96 (1971) (suspension of driver's license) "except in emergency situations (and this is not one) due process requires that when a State seeks to terminate an interest such as that here involved, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." Even more recently, the Supreme Court stated in *Commissioner v. Shapiro,* —— U.S. ——, ——, 96 S.Ct. 1062, 1072, 47 L.Ed.2d 278 (1976), a tax collection case in which the Internal Revenue Service had seized the appellant's assets:

> This Court has recently and repeatedly held that, at least where irreparable injury may result from a deprivation of property pending final adjudication of the rights of the parties, the Due Process Clause requires that the party whose property is taken be given an opportunity for some kind of predeprivation or prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made.

■ In holding that the present water termination procedures employed by the defendants do not comply with the requirements of the Due Process Clause, we are not deciding what procedures should be instituted by the defendants. It is not the Court's intention to inject itself into the internal affairs of the defendants by mandating the procedures which it should adopt to provide sufficient due process in the termination of water and sewer service. We are well aware of the Supreme Court's admonition in *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 607, 46 L.Ed.2d 561, 573 (1976), that "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between Federal equitable power and State administration of its own law.'" Where an injunction is sought under 42 U.S.C. § 1983 the principles of equity, comity and federalism

must restrain a federal court where the injunctive relief is sought against those in charge of the executive branch of local government such as the defendants in this case. 423 U.S. at 379, 96 S.Ct. at 608, 46 L.Ed.2d at 574.

*Substantive Due Process and Equal Protection Claim.*

■ In Count III of their Amended Complaint, the plaintiffs contend that the defendants have threatened to terminate water service to tenants unless the property owner's delinquent water bills are paid and that by so doing the defendants have attempted to collect delinquent water bills from tenants despite the fact that the tenants have no contractual liability for these delinquent water bills. The plaintiffs point out that the defendants refuse to supply water service to a tenant living in a premises which is subject to delinquent water bills unless the delinquent water bills are paid. Plaintiffs contend that there is no rational basis for attempting collection of delinquent water bills from the tenant who has no contractual liability for the bills and that such a procedure is a denial of due process. Plaintiffs also contend that by conditioning the continuance of water service to a tenant upon the payment by him of delinquent water bills for which is he not legally responsible is a denial of Equal Protection of the Laws. The defendants contend, however, that the collection of bills for water service is a legitimate governmental objective and that termination of water service to tenants for non-payment of delinquent water bills is reasonably related to the collection objective.

It is uncontradicted that it is the policy of the Collection Department to require payment of the delinquent bills to avoid a scheduled termination of water service no matter who is the user of the water service or who is legally responsible for the bill.[19] Payment of the entire delinquent bill is required of the current occupant of a prem-

---

judge after termination of benefits without the payment of any contested amount.

**19.** The following testimony was given during a deposition by Kenneth Carlin, the assistant rev-

ises in order to continue the water service even though the bill was incurred prior to the tenant moving into the premises.[20]

In *Davis v. Weir,* 497 F.2d 139 (5th Cir. 1974), the Fifth Circuit Court of Appeals was faced with a similar situation. In that case, an applicant for water service who was occupying a premises on which the landlord owed delinquent water bills was denied water service until the bill was paid. The Court stated:

"Under 'traditional' equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." The Water Works urges that the practice of rejecting water service applications until all accrued debts at the premises have been extinguished facilitates collection of unpaid bills at multi-unit dwellings and preserves the City's municipal revenue bond rating. No one could doubt that the Department's methods are calculated to expedite the liquidation of unpaid bills. A collection scheme, however, that divorces itself entirely from the reality of legal accountability for the debt involved, is devoid of logical relation to the collection of unpaid water bills from the defaulting debtor. The City has no valid governmental interest in securing revenue from innocent applicants who are forced to honor the obligations of another or face constructive eviction from their homes for lack of an essential to existence— water. "The fact that a *third-party* may be financially responsible for water service provided under a prior contract is an irrational, unreasonable and quite irrelevant basis upon which to distinguish between otherwise eligible applicants for water service." The Department's actions offend not only equal protection of the laws, but also due process.

. . . The City's dispute over past due charges at Davis' apartment lies solely with his landlord. To require that Davis make this payment and attempt to recover it from the landlord amounts to

enue commissioner for the Department of Collections:

> Q. Fine. Let's assume further that the tenant then informs the collection interviewer that he can't locate the landlord, and also assume that on your part, there has been no—you haven't been able to contact the landlord.
> A. Yes.
> Q. What would happen then? In other words, you stated to me, the landlord had to pay 50 percent, but let's assume the landlord can't be found by either party, either by your department or by the tenant.
> A. Right.
> Q. Then what would happen then if I was the tenant and I told you that and you knew that from your own investigation?
> A. Well, at this stage of the game, the interviewer, I am sure, would say, well, we are going to have to have the 50 percent down on this so that we can prevent the water from going off.
> Q. And that is 50 percent on the entire bill owing on the property.
> A. Of the bill, that is correct.

Deposition of Kenneth Carlin at 37–38.

**20.** The following testimony was also given by Mr. Carlin:

> MR. STEIN: Let me pursue that line for one question. In a situation where you had four tenants and four units and none of them lived there for that first year of the bill of that two years, $400 bill, and they were all just there for the second year, you know, wouldn't the department take into account the fact that they didn't live there for that year?
> THE WITNESS: Yes. I said I took the extreme situation that they were there. Yes, we might take that into consideration to a degree. Of course, we are still looking to the landlord for the payment and we still want payment of the bill. This might be taken into consideration, not that we want all the money. We still feel there is—all the money is owed, no question about that, whether the tenant was there a month or five years, but it might be a definite consideration when you are establishing some type of an arrangement. In other words, I don't think we could say to a tenant, now, look your bill is $400 but you are only there half the time and, therefore, depending upon what date they were there, I don't know, so therefore, you only owe $200 and forget the other 200. We just don't really get that because we are still looking for this payment, however, so long as we find somebody willing to go along with the situation, we would rather have that than have to shut the water off.

Deposition of Kenneth Carlin at 40–41.

nothing less than condemning Davis to pay the past debt of another before he is allowed to contract for water service. 497 F.2d at 144–145 (Citations and footnotes omitted).

This reasoning has been specifically approved by the Sixth Circuit in its recent opinion in *Craft v. Memphis Light, Gas and Water Division,* 534 F.2d 684 (1976). We likewise agree with the analysis of the Fifth Circuit in *Davis.* As pointed out earlier, a tenant who has faithfully been paying his rent to a landlord is suddenly faced with a water shut off to his residence unless he makes arrangements to pay the delinquent water bills for which he is not responsible. Such a tenant who is unable to pay a large delinquent water bill for which he is not responsible has no alternative but to abandon the premises. Such an event does not lead to an increase in revenue for the City of Philadelphia, but simply adds another abandoned premises. Since the defendants have no legitimate interest in collecting delinquent water bills from those who have no legal responsibility therefor, we declare the procedure unconstitutional under the Due Process Clause of the Fourteenth Amendment.